645 So.2d 389 (1994)
Michael CARUSO, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 73507.
Supreme Court of Florida.
October 6, 1994.
Rehearing Denied December 2, 1994.
*391 Richard L. Jorandby, Public Defender, and Jeffrey L. Anderson, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Celia A. Terenzio, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Appellant Michael Caruso, Jr., was convicted of two counts of first-degree murder. After the jury voted 11-1 to recommend life sentences on both counts, the trial judge sentenced Caruso to life imprisonment on one count and to death on the other. Caruso appeals his convictions and the death sentence. This Court has jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. We affirm the convictions, but because the jury override was improper, we vacate the sentence of death and remand for imposition of a life sentence without eligibility of parole for twenty-five years.
This case arose from a violent encounter during the early morning hours of Sunday, December 6, 1987, in the Broward County community of Pembroke Pines. An assailant entered the home of Genevieve and Gordon Leland, went through some of their belongings, and murdered the couple. Caruso, who lived with his parents in the house next door, claimed to have discovered the murders and initiated the report to authorities. In numerous statements at the scene and later, he denied any involvement in the crimes. The State claimed that Caruso killed the elderly couple while he was burglarizing their home to obtain cash and goods with which he could buy crack cocaine.
Caruso told police on the morning of the murders that he was returning from a morning walk at about 7:00-7:30 a.m. when he saw an unidentified black male, about five feet, ten inches tall with a medium "Afro" haircut, looking through the curtains of the front window from inside the Lelands' house. He said he became suspicious and knocked on the front door and side windows. When nobody answered, he went home, told his parents what he saw, and returned to the Lelands' house with his mother. As his mother checked the front of the house, he said he went around to the rear screen door *392 and through it saw Mrs. Leland's body. After his mother came over and saw the body, they returned to their house where Caruso's father called officials to report the incident. Caruso then went back to the Lelands' house to wait for the authorities, who arrived soon thereafter. He said he followed paramedics into the house, saw Mrs. Leland's body, and then saw Mr. Leland's body down the hallway.
The authorities discovered Mrs. Leland's body lying between the kitchen and livingroom, her face bloodied. She had been stabbed once in the upper back and once in the forehead above her right eye, and had been beaten about the face. Down a hallway at the entrance to one of the bedrooms, authorities saw a pile of "visqueen," a translucent tarp, with a broken champagne bottle and a "Saran Wrap" box nearby. The visqueen could be seen only by a person standing well inside the house. Beneath the visqueen lay Mr. Leland's body. He had been stabbed nine times in the upper back, once in the chest, and had blunt trauma and lacerations to the head. His head had been wrapped in Saran Wrap. Rigor mortis already had set in, and the medical examiner estimated the time of death as between midnight and 2 a.m.
Police testified that they first learned about Mr. Leland's head being wrapped in a substance when the medical examiner inspected the body at the crime scene, but they did not know it was Saran Wrap until the autopsy was performed. Police also said they did not know that Mrs. Leland has been stabbed above her eye until the autopsy. Officers said they kept those facts from the public during the course of the investigation because only the killer would know those details.
A reporter testified that at about noon Sunday Caruso told her he had walked into the house behind paramedics, saw Mr. Leland "with Saran Wrap or some plastic or something wrapped around his head," and saw that Mrs. Leland had been "stabbed in the eyes and everywhere else." Later that afternoon, Caruso appeared nervous when he discussed the murders with the mother of one of his friends. The mother said Caruso told her he discovered the bodies after he had gone to the Lelands' house that morning to do yard work for them, and he never mentioned having seen a black man inside the house. Two days later, Caruso discussed the murders with one of the Lelands' grandchildren and mentioned that Mr. Leland's head had been wrapped in Saran Wrap.
When officers first arrived at the Lelands' house, they found Caruso standing outside, his hair wet from a shower he said he had just taken. During the ensuing hours at the crime scene, officers noticed that Caruso had a fight with his father and had to be restrained. Officers observed Caruso experience mood swings throughout the day, ranging from fairly calm to hostile. His behavior was characterized as "bizarre" or "almost possessed." Detective Jorge Corpion testified that Caruso was combative in answering his questions that morning. When the bodies were removed, Caruso reportedly looked distressed, turned, and walked into his own house. Caruso also changed clothes during the day, and his mother laundered some of his clothes that morning, which she said was not unusual. Officials also testified that when they had someone stand at the window where Caruso said he saw a black male, they could only make out a silhouette, without any details of race or sex.
Police at the scene that morning noticed that Caruso's hands and arms were marked by relatively fresh cuts and abrasions, so they photographed them. The State's medical examiner testified that the marks had been made within the previous eight hours. Although Caruso allowed officials to photograph his hands, an officer testified that Caruso did not want to be fingerprinted.
Fingerprints identified as coming from the tips of Caruso's left middle and ring fingers were found in the Lelands' house on the front entrance door inside the middle panel. None of the other prints found at the scene matched Caruso's. Police said it appeared that someone wiped down objects in the house with a towel. Officers and others who entered the crime scene, as well as relatives of the Lelands, testified that they never saw Caruso enter the Lelands' house before or after the murders. However, Caruso's mother *393 and father testified in his defense that they saw their son follow paramedics into the Lelands' house, and his parents cautioned him to mind his own business.
A canine officer's dog followed a track it found leading from the Lelands' house. The track took the form of a "U", going about 100 feet before turning and ending between the Caruso and Leland houses. Police also found fresh tool marks on the door showing that somebody recently attempted to pry it open, and they found the tip of a knife near the doormat. Caruso possessed a knife with a broken tip, but it did not match the tip found at the crime scene. Craig Quinn, a friend of Caruso's, testified that when he tried to get Caruso's broken knife for police to examine, Caruso told him that he "broke the tip off on the old lady next door."
Quinn also said that at some point after the murders, Caruso sold him a gold butterfly pendant and chain, which Caruso said he got "next door." The victims' grandson identified the necklace as having belonged to Mrs. Leland. However, Caruso's mother, testifying for the defense, identified that necklace as her own missing necklace, and additional evidence was presented to establish that Caruso's grandmother had given his mother a butterfly necklace in 1986.
Quinn testified that Caruso used crack cocaine regularly, that he got Quinn back into crack use after a long period of being off cocaine, and that he frequently went with Caruso to Miami where Caruso knew crack dealers. Before midnight Saturday, December 5, Quinn said Caruso called him to "go out and party," which Quinn said meant smoking crack. Quinn declined. He next spoke to Caruso on Sunday, saying that Caruso appeared to be on drugs at the time, although not crack. Caruso was acting sluggishly, falling around a little bit, and was short-tempered and unable to talk straight. Around 3 p.m. that afternoon, Quinn picked up Caruso and they drove together to a black, low-income housing development in Miami, where they often went when Caruso had cash. Quinn pulled the car into a parking lot and Caruso ran into a nearby field, where he threw something. Quinn testified that he did not see what Caruso threw. Quinn said Caruso then ran to several different areas, retrieved his father's bicycle, and returned to the car. Caruso explained that he had been "partying" there the night before, and he had left the bike. They brought the bike back to Caruso's house, where Caruso, who appeared to be high, had an argument with his father. Caruso then left with Quinn to go to work, but Caruso was unable to work effectively, twice tripping over a lamp and breaking the bulbs, and acting irritable, quick, and sluggish. They left work and went to Quinn's grandmother's house where Quinn gave Caruso $20. Then they headed back to the housing development in Miami where they bought crack. Quinn said the only money Caruso had was the $20 he gave him. About two weeks later, Caruso was about to trade his father's chainsaw for drugs when Quinn convinced him to pawn it for cash instead. They pawned other items for drug money, too.
Shortly after the murders, Myrel Walker, a neighbor of the Lelands and the Carusos, told police that at about midnight Saturday, June 5, she saw Caruso standing in front of her house with a shiny object in his pocket. Walker said Caruso told her his car had broken down, and he asked to use the phone. She refused, and he left. An officer said that when he later interviewed Walker at her house, he observed what appeared to be pry marks on her front door.
Caruso did not testify. The jury found him guilty as charged on both first-degree murder counts.

GUILT PHASE
Caruso raises nineteen guilt-phase issues on appeal,[1] only some of which require *394 discussion.[2] We begin with evidentiary claims. First, Caruso argues that Craig Quinn was improperly permitted to testify about Caruso's drug activities because it constituted inadmissible and prejudicial evidence of bad character. We disagree. The State's theory was that Caruso burglarized the house for drug money, and when he was discovered, he killed the Lelands to prevent them from identifying him. Quinn's testimony regarding Caruso's drug-related activities established the relevant context in which the criminal acts occurred, Caruso's state of mind when the murders took place, and his motive to commit a burglary, which in turn was relevant to the State's felony-murder theory. See Jackson v. State, 522 So.2d 802, 806 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988). Craig v. State, 585 So.2d 278 (Fla. 1991), upon which Caruso relies, is distinguishable because evidence concerning the use of drugs in that case was unrelated to the murder.
In a related claim, Caruso argues that the State violated its notice obligation as set forth in section 90.404(2)(b), Florida Statutes (1987), with respect to the collateral crimes evidence, and that the judge's inquiry failed to satisfy the requirements of Richardson v. State, 246 So.2d 771 (Fla. 1971). As stated above, the collateral crimes evidence established the context in which the criminal acts occurred, Caruso's state of mind at the time, and his motive for the killings. Thus, there was no requirement that the State give notice under section 90.404(2)(b) or that the court conduct a Richardson hearing. However, the record shows that prior to trial the judge did hold an inquiry and was told that Caruso had deposed Quinn and had discussed the collateral crimes problem with the prosecutor. The judge agreed to limit Quinn's testimony, and otherwise found no procedural prejudice to Caruso's ability to prepare for trial. Thus, even if a Richardson inquiry had been required, we would find no error. See State v. Paille, 601 So.2d 1321 (Fla.2d DCA 1992).
Next we address the introduction of an officer's rebuttal testimony. The record shows that when both Caruso's mother and father testified for the defense, the State asked on cross-examination if they had ever said to Detective Pazienza that they were afraid of their son. They said no. In rebuttal, the State called a detective who testified, over objection, that on the night after the murders the Carusos told him they were afraid of their son. The trial judge overruled the objection but instructed the jury that the evidence was offered only to impeach or rebut the defense's evidence.
It is well established that if a witness is cross-examined concerning a collateral or irrelevant matter, the cross-examiner must "take" the answer, is bound by it, and may not subsequently impeach the witness by introducing extrinsic evidence to contradict the witness on that point. E.g. Patterson v. State, 157 Fla. 304, 313, 25 So.2d 713, 717, cert. denied, 329 U.S. 789, 67 S.Ct. 352, 91 L.Ed. 676 (1946); Stewart v. State, 42 Fla. 591, 594, 28 So. 815, 816 (1900); Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981); see generally Charles W. Ehrhardt, Florida Evidence § 608.1 (1993 ed.). Even if there is some relevancy, the evidence is subject to exclusion if its probative value is substantially *395 outweighed by the danger of confusing the issues, unfair prejudice, misleading the jury, or needless presentation of cumulative evidence. See Lee v. State, 422 So.2d 928, 931 (Fla. 3d DCA 1982); review denied, 431 So.2d 989 (Fla. 1983); see also Charles W. Ehrhardt, Florida Evidence § 608.1 (1993 ed.) (impeachment evidence of collateral matters may be excluded under section 90.403, Florida Statutes); 1 McCormick on Evidence § 49 (John William Strong, ed., Practitioner Treatise Series 4th ed. 1992) (use of extrinsic evidence of collateral matters to contradict a witness's testimony "is more restricted due to consideration of confusion of the issues, misleading the jury, undue consumption of time, and unfair prejudice.").
The only basis for admission of the officer's testimony could have been to impeach with statements inconsistent with the witnesses' present testimony. However, the parents' fears were collateral to any material issue, including bias. As such, the State was bound to accept the parents' denials on cross-examination, and the court erred by allowing the rebuttal witness to testify in an attempt to impeach. However, given the evidence in this record, we find the error harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
We also find harmless the admission into evidence, over objection, of Officer Walsh's statement that he felt only the killer would know about Mr. Leland's head being wrapped in Saran Wrap. The judge overruled the objection on the ground that no objection had been made when previous witnesses testified to essentially the same point. That was error because the fact that other witnesses previously testified without objection did not procedurally bar this contemporaneous objection. See Wyatt v. State, 641 So.2d 355 (Fla. 1994). Moreover, the timely objection was well founded because lay witnesses generally are not permitted to offer opinions or inferences, and this inference should have been left for the jury to draw on its own. See § 90.701, Fla. Stat. (1987). However, under the circumstances we find the error harmless beyond a reasonable doubt. See DiGuilio.
Caruso raises two issues concerning the testimony of Myrel Walker. First, the State concedes that the trial court erroneously admitted into evidence prior consistent statements of Myrel Walker to boost her credibility. Nonetheless, we agree with the State that the error was harmless beyond a reasonable doubt when viewed in light of all the evidence in this record. See DiGuilio.
Second, two officers testified, over hearsay objections, as to their conversations with Walker. Officer Raimondi said they went to Walker to ask her about a white male she reported having seen at midnight December 5. Officer Faby said Walker gave him a description of the man she saw, and the description matched Caruso. The State argues the testimony was not inadmissible hearsay because it was introduced only to show what the officers did pursuant to information they had received, relying on Johnson v. State, 456 So.2d 529 (Fla. 4th DCA 1984), review denied, 464 So.2d 555 (Fla. 1985). But in our recent decision in Conley v. State, 620 So.2d 180, 183 (Fla. 1993), we disapproved Johnson and held that the prejudice of out-of-court statements used to relate accusatory information but offered simply to establish the logical sequence of events outweighs the probative value of such evidence, rendering it inadmissible. We find Conley applicable here. However, the evidence amounted to no more than a prior consistent statement to corroborate Walker's testimony, which we found harmless above, and the declarant was cross-examined about this subject, thereby mitigating the prejudice. Under the circumstances, we find the error harmless beyond a reasonable doubt. See State v. Baird, 572 So.2d 904, 908 (Fla. 1990); DiGuilio.
Lastly, we reject Caruso's claim that the evidence was insufficient to support first-degree murder convictions. To the contrary, there was substantial competent evidence to support the judgments as to both first-degree murder counts. We also have considered the cumulative effect of the errors found above and we find beyond a reasonable doubt that there is no reasonable possibility the errors, taken alone or together, contributed to the convictions. See Jackson v. *396 State, 575 So.2d 181 (Fla. 1991); DiGuilio. Accordingly, we affirm the convictions.

PENALTY PHASE
In the penalty phase, the State's medical examiner testified that the Lelands were alive when the blows were struck. It took Mr. Leland fifteen minutes to succumb, and if he was fully conscious, he would have been in pain. Mrs. Leland could have lived no more than five minutes after she was attacked. Her head injuries would have been painful if she were conscious, but they happened close to the time of death, the doctor said.
Caruso did not testify. He presented various witnesses who said he was a loving, nonviolent person; he had been a good worker; he had been voluntarily hospitalized for overdoses of cocaine three times between November 1986 and June 1987; that his family could not afford to complete his treatment; and he apparently attempted to commit suicide by cutting his wrists because he thought he was failing his parents due to his drug usage. Caruso was twenty years old at the time the murders were committed.
Caruso also presented the testimony of a clinical forensic psychologist, Dr. Glenn Ross Caddy, who examined Caruso's records and spoke with those who know him. The psychologist testified that Caruso may have begun using alcohol and marijuana at fifteen or sixteen years of age, and that he had been heavily involved with cocaine in the previous twelve to eighteen months, rapidly advancing to "overdose states." Dr. Caddy said people who repeatedly use crack cocaine experience a "quality of bizarreness" that overcomes thinking much more than with alcohol. They become emotionally disturbed, do not act as they normally would, become "almost totally disinhibited," and take "stupid high risks," often of a criminal nature.
Dr. Caddy said crimes as violent as these murders would have to be committed either by an extreme sociopath  a person who doesn't care about others  or by one who acted in tremendous rage and out of control, disconnected from otherwise well-adjusted behavior due to the effects of profound drug use, in this case, crack cocaine. To his knowledge, Caruso appeared to have no history of sociopathy. The psychologist also said that profound crack cocaine addiction can be treated, and for one with no profound psychopathology, the prognosis could be fair. He did not opine as to Caruso's prognosis because he did not personally examine him. Caruso's records also indicated that he had been a lackluster student who dropped out in the ninth grade, and that he had become violent while hospitalized, although the records did not state whether the violence was physical or verbal, the psychologist said.
Other evidence indicated that Caruso was on probation for a 1985 grand theft at the time the murders were committed, but both sides stipulated that this was the extent of his criminal history. Also, his parents did not know their son to have used cocaine on the night before the murders.
The jury voted 11-1 to recommend life sentences on both counts. In his findings, the trial judge found in aggravation the previous conviction of another capital offense based on the contemporaneous convictions;[3] Caruso was "engaged in the commission of or an attempt to commit or fleeing after committing or attempting to commit the crime of burglary";[4] both murders were "especially wicked, evil, atrocious and cruel";[5] and both murders were cold, calculated, and premeditated without any pretense of moral or legal justification.[6] The judge found no applicable statutory or nonstatutory mitigating circumstances, specifying that "no aspect of this crime ... justifies consideration of any nonstatutory mitigating factors." The judge concluded that the jury's life recommendation was unreasonable, but without further explanation, he followed the jury's life recommendation as to the murder of Genevieve Leland and overrode the jury's recommendation for the murder of Gordon Leland.
*397 Caruso first alleges that the trial court erroneously overrode the jury's recommendation. We agree. In Tedder v. State, 322 So.2d 908 (Fla. 1975), we held that "to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Id. at 910. Evidence in this record does establish a reasonable basis for the jury's recommendation of life.
As we have said many times, a jury may reasonably consider the defendant's intoxication to support a life recommendation. E.g., Parker v. State, 643 So.2d 1032 (Fla. 1994); Stevens v. State, 613 So.2d 402, 403 (Fla. 1992); Cheshire v. State, 568 So.2d 908, 911 (Fla. 1990); Holsworth v. State, 522 So.2d 348, 354 (Fla. 1988); Norris v. State, 429 So.2d 688, 690 (Fla. 1983); Buckrem v. State, 355 So.2d 111, 113-14 (Fla. 1978).
Quinn said Caruso told him that on Saturday night he had been "partying," which Quinn knew to mean smoking crack, and on Sunday Caruso appeared to be on drugs, acting sluggishly, falling around a little bit, and was short-tempered and unable to talk straight. His behavior Sunday was also characterized by officials as "combative," "bizarre," and "almost possessed." Later that afternoon his behavior still appeared to be odd as he was argumentative, clumsy, irritable, quick, sluggish, and unable to work effectively. This evidence, combined with Caruso's history of crack cocaine addiction, his pursuit of crack that weekend, expert testimony about his psychological history and the effects of crack, and evidence that Caruso was normally known to be a loving, nonviolent person and a good worker, was sufficient for a jury to have reasonably concluded that he may have been intoxicated on drugs and committed these murders in an irrational, drug-induced frenzy. See Holsworth v. State, 522 So.2d 348, 354 (Fla. 1988) ("evidence concerning drugs and alcohol, in conjunction with the testimony of numerous witnesses that Holsworth was generally a quiet, nonviolent person, was sufficient for the jury to reasonably have concluded that he may have been high on PCP and alcohol at the time of the murder"); Amazon v. State, 487 So.2d 8, 13 (Fla.) (jury's life recommendation could have been reasonably based on belief that double homicide resulting from multiple stab wounds were committed in "irrational frenzy" by immature 19-year-old who had history of drug abuse, may have been intoxicated at the time, and was an "emotional cripple"), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986).
Jurors also reasonably could have found in mitigation not only that Caruso had a longterm drug addiction, see, e.g., Parker v. State, 643 So.2d 1032, 1035 (Fla. 1994); Scott v. State, 603 So.2d 1275, 1277 (Fla. 1992), but that he recognized his drug problem, attempted suicide in connection with his drug addiction, and voluntarily sought hospital treatment three times in the thirteen months preceding the murders.
Additional factors the jury reasonably could have taken into consideration were his youth, see Perry v. State, 522 So.2d 817, 821 (Fla. 1988) (jurors reasonably could have considered defendant's age of twenty-one to support life recommendation); that he was known by family members as loving, nonviolent, and a good worker, see, e.g., Scott, 603 So.2d at 1277; Bedford v. State, 589 So.2d 245, 253 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992); Holsworth, 522 So.2d at 354, and that he had no history of violent criminal behavior, see Ross v. State, 474 So.2d 1170, 1174 (Fla. 1985).
We also note that the trial judge did not articulate any compelling distinction between the murders to justify distinguishing the sentences in light of the jury's identical recommendations, and our independent review of the record reveals none.
In conclusion, the facts suggesting a sentence of death were not so clear and convincing that virtually no reasonable person could differ. Because we find a reasonable basis for the jury's recommendation, we have no need to address other penalty-phase issues raised by Caruso.[7]

*398 CONCLUSION

For the reasons stated above, we affirm the convictions, vacate the sentence of death, and remand for imposition of a life sentence without eligibility of parole for twenty-five years.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] The errors alleged in the guilt phase were: (1) introducing evidence of Caruso's drug use; (2) introducing an autopsy photograph; (3) introducing testimony that Caruso's parents said they were afraid of their son; (4) introducing bad character evidence that Caruso stole and attempted to pawn his father's chainsaw; (5) failing to conduct an adequate inquiry regarding State's alleged violation of section 90.404(2)(b), Florida Statutes (1987); (6) failing to conduct adequate inquiry and denial of continuance with respect to an alleged discovery violation; (7) introducing officer's conclusion about facts only the killer would know; (8) introducing photographs of the victims' house as inaccurate representations of the scene at the relevant time; (9) state's use of prior consistent statements to bolster a witness's testimony; (10) introducing hearsay testimony of two officers; (11) introducing hearsay statement about the crime scene being secured; (12) repeated dilution of the presumption of innocence; (13) the court's instructing jurors that they could not have any testimony read back to them; (14) the court's informing jurors that they could not take notes during the trial; (15) the court's instructing jurors that appellate courts review circuit court decisions; (16) evidence and argument with respect to Caruso's exercise of his legal right to refuse to be fingerprinted absent a showing of cause; (17) unconstitutional instruction on reasonable doubt; (18) first-degree murder was improperly submitted to the jury on alternative theories of premeditated and felony murder; and (19) insufficient evidence to support first-degree murder convictions.
[2] We reject without discussion issue 2 (no merit); issue 4 (not preserved); issue 6 (no merit); issue 8 (no merit); issue 11 (no merit); issue 12 (not preserved); issue 13 (no merit); issue 14 (no merit); issue 15 (no merit); issue 16 (not preserved); issue 17 (not preserved); and issue 18 (not preserved).
[3] See § 921.141(5)(b), Fla. Stat. (1987).
[4] See § 921.141(5)(d), Fla. Stat. (1987).
[5] See § 921.141(5)(h), Fla. Stat. (1987).
[6] See § 921.141(5)(i), Fla. Stat. (1987).
[7] Other penalty-phase claims presented were (21) The trial court erred by entertaining victim impact information prior to sentencing; (22) The trial court committed substantial errors in the sentencing order; (23) Florida's death penalty statute is unconstitutional on a variety of grounds; (24) The aggravating circumstances used in this case are unconstitutional; and (25) The jury override was unconstitutional because it was arbitrary and irrational.