DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KAREEM DANIEL FARRELL,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D13-2589

[May 13, 2015]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Gary L. Sweet, Judge; L.T. Case No. 562010CF002086A.

Carey Haughwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Allen R. Geesey, Assistant Attorney General, West Palm Beach, for appellee.

LEVINE, J.

Appellant appeals his conviction for aggravated child abuse and sentence of thirty years' imprisonment. Appellant raises multiple issues on appeal, the majority of which we find are without merit. The only issue we address is that regarding the state's cross-examination of one of appellant's expert witnesses. Because we find the cross-examination did not constitute reversible error, we affirm.

The state charged appellant with aggravated child abuse under section 827.03(2), Fla. Stat. (2010), alleging that he shook his eight-month-old nephew, causing the child to suffer severe retinal bleeding and brain injuries.

At trial, the child's mother testified that her brother, appellant, was living with her and her two children at the time of the incident. The mother stated that the victim had been acting normally until the day prior to the incident, when she noticed he was not eating his whole bottle and cried more than usual. On the day of the incident, the child was more active, but still not eating normally.

At some point during the day, the mother left appellant to watch the children while she did laundry in another part of the home. She checked on them and noticed the child was sitting on the floor and "it looked like he was falling asleep and he kinda like limped over to his side." When the mother picked up the child, she noticed he had a small amount of blood on his mouth, which she washed off. She tasked appellant with putting the child down for a nap.

Approximately ten to fifteen minutes later, the mother went to go check on the child and was met in the hallway by appellant, who was holding the child and stated that the child was not breathing properly. Appellant called 911 while the mother gave the child CPR until an ambulance arrived.

The mother testified that the child now can no longer eat normally and is fed via a tube. She also testified that she thinks he can see her, but cannot walk or talk.

The state called Dr. Lee Friedman, a pediatric ophthalmologist, who testified that he examined the child on the day after the incident. The doctor stated the child had "multiple, multilayer deep hemorrhages in the back of the right eye – massive throughout the retina from the optic nerve to the macula all the way to the periphery of the eye." The doctor testified there were less severe hemorrhages scattered throughout the left eye as well.

He testified that the eye injuries, when combined with the appearance of bruises on the body and bleeding in the brain, are commonly seen in cases of Shaken Baby Syndrome or "non-accidental head trauma." The doctor stated that the eye hemorrhages are thought to be caused by "shearing forces from the gel in the eye" and were "extremely unlikely" to be caused by a short distance fall. He testified that injuries as extensive as the ones seen in this case were unlikely to be caused by more substantial head traumas, such as falling from a jungle gym or a car accident, and were not of the sort caused by increased intracranial pressure. The doctor also testified that the injury definitely occurred "within the past couple of days," based on the presence of active blood and no sign of healing.

A detective from the Port St. Lucie Police Department interrogated appellant a few days after the child's injuries. The detective identified an apology letter that appellant wrote to the mother at the end of his

interview. An audio/video recording of appellant's interrogation was played for the jury.

In the recording, appellant told the detective that the child was not sleeping well and may have had an ear infection, but was otherwise fine. Appellant later stated that the child had been "acting strange" all week. On the day of the incident, appellant walked into the room, and the child "just flopped over" from where he was propped up next to his mattress. Appellant stated he alerted the mother and they "sat him on the sofa and he took a breath and stopped breathing just like that."

Later in the same interview, the detective began to ask appellant if what happened was "intentional" or "unintentional." Appellant stated that he was worried about the mother losing her children. He denied that anything could have been intentional. The detective told appellant this was a "fixable" mistake. Appellant eventually stated, "I did it – I did it – I did it, ma'am." When asked what happened, appellant stated, "I shook him." The detective continued questioning appellant:

> Q: I don't want – I don't want to worry about whether or not [the mother] is going to lose her kids. What I want to know is what happened to this little boy to cause this and I want the truth.
> A: He was shaken.
> Q: Who shook him?
> A: I did.
> Q: What happened?
> A: I did it, ma'am.
> Q: What happened?
> A: Just – I'm – I'm telling a lie. I can't do it ma'am, I can't lie. I can't. . . . [The mother] is only 26-years-old. . . .
>
> . . . .
>
> A: I shook him. I just walk up to him and shake – [the child] had his meltdown, I was so scared. I ain't know if he was alive, I ain't know what to do. . . . [H]e wouldn't come back.

Appellant reiterated that he shook the child "to bring him back" and that he "wasn't shaking the life out of him." He also stated this was unintentional and he never meant to hurt his nephew. Appellant later clarified that he shook the child "two hours – or a hour before – 30 minutes at least" before appellant walked into the child's room to find him "flopped over" near his mattress.

3

The state called Dr. Randall Alexander, a professor of pediatrics who serves as a statewide medical director for all of Florida's Child Protection Teams. The professor reviewed the child's medical records and noted that the child had skin irritation marks on his body and bruising on his chest that was not typical of CPR. The medical records also showed the child had internal injuries, including bruising on the lungs, fluid in the abdomen, and swelling in the brain. The professor testified that the victim's brain injury would have been fatal without medical intervention. The injury could not have occurred a week prior, because there was brand new blood in the head and the injury had not yet started to heal. The professor further testified that the injuries in this case were not consistent with a short fall or intracranial pressure. The child's brain showed substantial damage and he would probably suffer from cerebral palsy of his left side, vision problems, and developmental delays. The professor also testified that Shaken Baby Syndrome was globally recognized by major medical organizations.

Appellant's first expert witness was Dr. Willey, a pathologist and former medical examiner. The pathologist testified that he, as well as a number of other people in the medical community, deny the validity of Shaken Baby Syndrome, although he recognized this viewpoint is in the minority. He also testified that he believed the alleged bruises on the victim's lungs were actually fluid in the chest caused by medical care, and that the shaking described by appellant would be insufficient to cause the damage seen in the victim.

Appellant next called Dr. Lloyd, a biomechanist with the Department of Veterans' Affairs. Appellant asked Dr. Lloyd generally about his education, scientific studies, publication history, and professional experience. Dr. Lloyd testified that a fall would be more likely to cause these injuries than shaking, because the neck ligaments would absorb some of the momentum in a shaking motion. He stated that he conducted a study which determined the average adult was incapable of generating sufficient acceleration to cause brain injury by shaking. He also stated that shaking was incapable of causing retinal bleeding, but instead blamed increased pressure in the brain.

On cross-examination and over defense objection, the state questioned Dr. Lloyd about inconsistencies in prior versions of his curriculum vitae. Specifically, his C.V. from October 2012 stated that he was a professor of medicine at University of South Florida ("USF"). By January 2013, this C.V. entry now stated that his status as professor was "in process." By

March 2013, any reference to being a professor at USF was removed entirely.

Dr. Lloyd explained that these C.V. changes were due to a misunderstanding with the university. He initially believed he had received a "courtesy appointment" as a professor of medicine at USF, but when the department chairman was replaced, he learned his application had not been completed. The state also asked about a cease and desist letter sent to Dr. Lloyd by the university asking him to take the alleged position off his website. He explained that different positions and titles help in the grant application process and in securing funding.

In closing argument, the state referenced this line of questioning by telling the jury, "Again, is this someone who is overstating his credentials, who has an interest in making money from this case?"

The jury returned a verdict of guilty as charged of aggravated child abuse. Appellant timely appeals.

On appeal, appellant argues the state should not have been allowed to question Dr. Lloyd about inconsistencies in his C.V., as such questioning was an impermissible attack on his character and improper impeachment, as evidence of particular bad conduct.[1] The state responds that these questions were proper impeachment of Dr. Lloyd through demonstration of "bias, corruption, or lack of competency." The state argues that appellant's questioning of Dr. Lloyd regarding his credentials and experience opened the door for the state to question him about these inconsistencies. The state also argues the questions were germane to his credibility and the matters addressed on direct examination.

"A trial court's decision to admit or exclude evidence is reviewed by utilizing the abuse of discretion standard of review. However, this discretion is limited by the rules of evidence." *Alexander v. State*, 103 So. 3d 953, 954 (Fla. 4th DCA 2012) (citation omitted). Likewise, the scope and limitation of cross-examination in a criminal trial "lies within the sound discretion of the trial court and is not subject to review except for a clear abuse of discretion." *Tompkins v. State*, 502 So. 2d 415, 419 (Fla. 1986).

---

[1] Because appellant did not object when the state asked Dr. Lloyd about the cease and desist letter from USF, he waived his objection to this line of questioning. *Morrison v. State*, 818 So. 2d 432, 445 (Fla. 2002).

Cross-examination serves two purposes: "(1) to weaken, test, or demonstrate the impossibility of the testimony of the witness on direct examination and, (2) to impeach the credibility of the witness, which may involve, among other things, showing his possible interest in the outcome of the case." *Steinhorst v. State*, 412 So. 2d 332, 337 (Fla. 1982). "Therefore it is held that questions on cross-examination must either relate to credibility or be germane to the matters brought out on direct examination." *Id.*

Further,

> [w]henever an expert testifies, counsel may cross-examine the expert regarding any matter about which the expert testifies in establishing his or her qualifications, both as a basis of arguing that the witness is not qualified as an expert and to argue that even if he or she is qualified, the jury should not give the opinion testimony great weight.

*Flores v. Miami-Dade Cnty.*, 787 So. 2d 955, 957 (Fla. 3d DCA 2001) (*quoting* Charles W. Ehrhardt, *Florida Evidence* § 702.5, at 601-03 (2001)). *See also Cheshire v. State*, 568 So. 2d 908, 913 (Fla. 1990) ("Any deficiencies in an expert's qualifications, experience and testimony may be aired on cross-examination . . . .").

Any attack on an expert witness's credibility is subject to a section 90.403 balancing analysis. *See Grau v. Branham*, 761 So. 2d 375, 378 (Fla. 4th DCA 2000) (holding that once the trial court determined that allowing the appellee to ask about the appellant's expert witness's drug abuse "was more prejudicial than probative," "its decision to then admit same was an abuse of discretion," but amounted to harmless error because it "pertained only to a collateral matter").

In the instant case, the state cross-examined Dr. Lloyd about prior versions of his C.V. listing job titles he never officially held. Such questioning was "germane to the matters brought out on direct examination," because appellant's counsel asked Dr. Lloyd about his professional experience and credentials for testifying as an expert. *Steinhorst*, 412 So. 2d at 337. The state was entitled to cross-examine Dr. Lloyd regarding his qualifications as they related to his credibility as an expert. *Flores*, 787 So. 2d at 957; *Steinhorst*, 412 So. 2d at 337. Thus, the trial court did not abuse its discretion in allowing the state's questioning.

6

Even assuming arguendo that the cross-examination was erroneous, we would still affirm on the basis that the alleged error was harmless. Any error regarding improper cross-examination of a witness is subject to harmless error analysis. *See Tormey v. Trout*, 748 So. 2d 303, 306 (Fla. 4th DCA 1999). An error is harmless where the state, as the beneficiary of the error, can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). The "application of [the harmless error] test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." *Id.*

We believe that the state met its burden and any error resulting from the state's cross-examination was harmless. The cross-examination of Dr. Lloyd about his C.V.s was brief and isolated, constituting an insignificant portion of the trial and of Dr. Lloyd's testimony. The state's questioning "was not so pervasive as to require the granting of a mistrial or new trial especially in light of the other abundant evidence upon which the jury could have weighed this doctor's testimony." *Tormey*, 748 So. 2d at 306. In fact, Dr. Lloyd was able to explain the discrepancies within his C.V.s. Furthermore, the state did not repeatedly reference Dr. Lloyd's overstated credentials during the remainder of the cross-examination, which focused specifically on his research, scientific studies, and opinion in this case. Finally, the state made only a single brief, isolated reference to the cross-examination during closing argument. Therefore, we conclude that there is no reasonable possibility that the error, if any, contributed to the verdict.

In summary, we find that the cross-examination of appellant's expert witness in the accuracy of his C.V. was not error, and even assuming it was error, it was clearly harmless and would not be grounds for reversal. Thus, we affirm.

*Affirmed.*

GERBER, J., concurs.
FORST, J., concurring specially with opinion.

FORST, J., concurring specially.

I write separately solely on the issue of improper impeachment of Appellant Kareem Daniel Farrell's expert witness. Dr. Lloyd, a

7

biomechanist with the Department of Veterans' Affairs, was called at trial to refute the State's theory that the injuries to the victim were indicative of the child being shaken. In my view, the State's questions about inconsistencies in prior versions of Dr. Lloyd's curriculum vitae (CV) were improper. However, I join the majority opinion's harmless error analysis and conclusion that any error resulting from the state's cross-examination was harmless.

## Improper Questioning

Dr. Lloyd is part of a growing minority in the biomedical field who dispute the traditional acceptance of Shaken Baby Syndrome.[2] At trial, he testified that his experiments showed an adult human is physically incapable of shaking a child hard enough to create the acceleration necessary to damage the child's brain. In addition to properly cross-examining Dr. Lloyd on the contents of his testimony, the State chose to go beyond the bounds of proper impeachment (see below) and questioned him about a position that appeared on prior versions of his CV, but was not listed in the most recent version. Specifically, Dr. Lloyd's CV from October 2012 stated that he was a professor of medicine at the University of South Florida (USF). By January 2013, this CV entry now stated that his status as professor was "in process." By March, any reference to being a professor at USF was removed entirely. Neither of the prior versions of the CV were offered into evidence or discussed during direct examination of Dr. Lloyd.

While Dr. Lloyd had a reasonable explanation for the changes in his CV, the questions were nonetheless improper. Under section 90.608, Florida Statutes (2013), parties can impeach a witness by: "1) introducing statements of the witness which are inconsistent with the witness's present testimony; 2) showing that the witness is biased; [or] 3) attacking the character of the witness in accordance with the provisions of sections 90.609 or 90.610." If a party chooses to impeach by attacking the character of a witness, it must do so by admitting evidence in the form of reputation (under section 90.609) or conviction of certain crimes (under section 90.610). Therefore, "evidence of particular acts of ethical

---

[2] This minority view has recently been used to overturn convictions in shaken baby cases around the country. For more information on the science for and against the diagnosis of Shaken Baby Syndrome, *see* Debbie Cenziper, *A Disputed Diagnosis Imprisons Parents*, WASH. POST, Mar. 20, 2015, available at http://www.washingtonpost.com/graphics/investigations/shaken-baby-syndrome/.

misconduct cannot be introduced to impeach the credibility of a witness." *Pantoja v. State*, 59 So. 3d 1092, 1096 (Fla. 2011). These questions were impermissible attacks on Dr. Lloyd's credibility or character. *See also Farinas v. State*, 569 So. 2d 425, 429 (Fla. 1990) (holding that questioning expert witness about specific allegations of misconduct was improper impeachment); *Roosevelt v. State*, 42 So. 3d 293, 296 (Fla. 3d DCA 2010). (holding that the State could not impeach an expert witness with evidence concerning past issues with the payment of taxes).

"The proper purposes of cross-examination are: (1) to weaken, test, or demonstrate the impossibility of the testimony of the witness on direct examination and, (2) to impeach the credibility of the witness, which may involve, among other things, showing his possible interest in the outcome of the case." *Steinhorst v. State*, 412 So. 2d 332, 337 (Fla. 1982). We have stated that "included in the types of matters that demonstrate bias are prejudice, interest in the outcome of a case, and any motivation for a witness to testify untruthfully." *Becker v. State*, 110 So. 3d 473, 476 (Fla. 4th DCA 2013) (quoting *Jones v. State*, 678 So. 2d 890, 892 (Fla. 4th DCA 1996)). Dr. Lloyd stated that having the honorary title of professor of medicine helped him gain grants and funding for his research. However, while this shows that he may have had a reason to misstate his job title on his CV, it does not show any bias in his testimony in the case at hand. Dr. Lloyd had no interest in the outcome of this case and his position (or lack thereof) as a professor of medicine was collateral to his testimony, as he did not mention this position during direct examination or state he had medical training. Therefore, these questions should have been excluded and the trial court erred by allowing these questions.

### The Error was "Harmless"

An error is harmless where the State, as the beneficiary of the error, can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). In a case with competing expert testimony, the credibility of the experts is of paramount importance. Here, the defense was able to, essentially, "rehabilitate" Dr. Lloyd's credibility, by eliciting testimony that explained the discrepancies within his C.V.s. The state's questioning was over the line and, accordingly, I do not join the majority opinion in concluding that the trial court did not abuse its discretion in allowing the state's questioning. However, I agree with the majority that the harm to defendant's case was too tangential or collateral as to necessitate reversal. *Grau v. Branham*, 761 So. 2d 375, 378 (Fla. 4th DCA DCA 2000); *Caruso v. State*, 645 So. 2d 389, 394 (Fla.

9

1994).

* * *

***Not final until disposition of timely filed motion for rehearing.***