# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————————

No. 1D2022-4126

———————————————————

DOUG CANTREL HEATH,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

———————————————————

On appeal from the Circuit Court for Alachua County.
William E. Davis, Judge.

June 19, 2024

ROWE, J.

Doug Cantrel Heath appeals his convictions for first-degree murder and attempted first-degree murder while possessing a firearm. He argues that the trial court erred when it denied his motion to continue, allowed the admission of testimony about prior incidents of domestic violence, and imposed the costs of prosecution. As to the third issue, we affirm for the reasons stated in *Parks v. State*, 371 So. 3d 392 (Fla. 1st DCA 2023). As to the other issues, we affirm for the reasons explained below.

*Procedural History*

Heath, Martesha Williams Johnson, and Jasmine Webb were implicated in the first-degree murder of T.B. and the attempted

first-degree murder of D.W. Webb agreed to testify against Heath and Johnson, who were scheduled to be tried together.

During a case management hearing in September 2022, Heath orally moved to continue the trial until January 2023. At the same time, Johnson asserted her speedy trial rights and demanded a trial in October 2022. The State objected to Heath's motion for continuance because a joint trial would benefit the victims' families. The court granted Johnson's speedy trial request, and it set the joint trial for the October term. The court denied Heath's motion for continuance but invited Heath to file a written motion advocating for separate trials.

Heath's counsel responded to the court's invitation by filing a written motion for continuance and severance. In support of the motion to continue the trial, counsel listed fifteen witnesses she asserted that she needed to depose before trial. She explained that she did not have time to prepare for an October trial because she had another trial scheduled at the end of September and other previously scheduled court appearances. As to the severance of the trials, counsel argued that severance was necessary to preserve Johnson's speedy trial rights and Heath's right to a fair trial.

In October, the parties appeared again before the court. Heath's counsel informed the court that she had deposed six of the fifteen witnesses identified in the written motion for continuance. She maintained that the testimony of the remaining witnesses might be crucial if they observed the shooting, and explained that she still needed to verify some of the information provided to the police.

The State responded that the remaining witnesses had been interviewed by the police and their statements could be found in police reports. When Heath's counsel argued that the trial should be continued because she had another trial scheduled during the October term, the prosecutor offered to continue the other case so that Heath and Johnson could be tried together. Based on these arguments, the trial court again denied the motion to continue.

A week later, Heath's counsel moved for a continuance for third time. The trial court denied the motion. Heath's counsel

moved for a continuance a fourth time, arguing that she tried to depose two potential eyewitnesses (James Carter and Willie Hall), but both failed to appear. The State responded that it had not deposed those witnesses either. The trial court denied the motion to continue and explained that Heath's counsel would have ample time to talk to witnesses at trial before they testified.

## Trial

Heath, Johnson, and Webb were involved in a three-person romantic relationship. Heath and Webb were together for about fifteen years and had three children together. Johnson became involved with the couple a few months before the shooting. Then, when Webb and Heath took a break in their relationship, Webb began a sexual relationship with D.W.

When Heath learned about Webb's relationship with D.W., he became enraged. Heath took Webb's mobile phone from her and used it to call D.W. Heath demanded to know if D.W. had been involved with Webb. D.W. was hosting a barbecue at his house when he received the call. D.W. denied involvement with Webb until he heard what sounded like someone hitting Webb and her crying in the background. D.W. then admitted having been involved with Webb. Heath became angrier and told D.W. that he knew where D.W. lived.

After ending the call with D.W., Heath grabbed his guns and placed them in his black Nissan truck. Although Webb insisted that she did not know what Heath was planning, she rode with him to Johnson's home and heard Heath call Johnson to ask for her gun clip. After Heath and Webb arrived at Johnson's home, the trio departed in two vehicles: Heath drove his truck, and Johnson and Webb followed in Johnson's minivan. Two of Johnson's children were passengers in the minivan. The group stopped at a convenience store. There, Webb got out of Johnson's minivan to ride with Heath.

Heath used the location data on Webb's phone to locate and drive to D.W.'s home. As the two vehicles neared the home, they stopped and left Johnson's minivan—along with her children—on the side of the road. Webb then drove Heath's truck. Johnson was

3

in the front passenger seat, and Heath was in the back seat. Heath told Webb to drive slowly as they passed D.W.'s house. Webb then saw Heath shooting an AR-15 out of the back window of the truck. Johnson was jumping up and down with excitement saying, "shoot, daddy, shoot." Webb stated that she sped away when Heath started shooting.

D.W. testified that he saw a black Nissan truck drive by his house, and then he heard gunshots. He avoided injury by diving to the ground. But T.B., who was visiting D.W.'s home for the barbecue, suffered a gunshot wound to his arm and chest. T.B. died at the scene. D.W. said the shooting occurred about an hour after he argued with Heath on the phone.

The jury found Heath guilty of first-degree murder and attempted first-degree murder while possessing a firearm. The court sentenced him to consecutive life terms in prison with a ten-year mandatory-minimum term on the attempted murder conviction. This timely appeal follows.

*Analysis*

Heath argues that the trial court erred by (1) denying his motions to continue, and (2) allowing the admission of testimony about prior incidents of domestic violence between Heath and Webb. We review both issues for an abuse of discretion. *See Madison v. State*, 132 So. 3d 237, 240 (Fla. 1st DCA 2013) (reviewing for an abuse of discretion the denial of a motion for continuance); *Ivey v. State*, 374 So. 3d 924, 926 (Fla. 1st DCA 2023) (reviewing for an abuse of discretion the admission of collateral crime evidence).

*Motion to Continue*

When ruling on a motion to continue based on an assertion of insufficient time to prepare for trial, a trial court should consider these factors, sometimes referred to as the *McKay* factors:

> 1) the time available for preparation, 2) the likelihood of prejudice from the denial, 3) the defendant's role in shortening preparation time, 4) the complexity of the

4

case, 5) the availability of discovery, 6) the adequacy of counsel actually provided and 7) the skill and experience of chosen counsel and his pre-retention experience with either the defendant or the alleged crime.

*McKay v. State*, 504 So. 2d 1280, 1282 (Fla. 1st DCA 1986). Even so, counsel and the trial court are not required to "engage in an elaborate discussion of caselaw; instead, a trial court's exercise of discretion need only be based on consideration of the *McKay* factors." *Madison*, 132 So. 3d at 242. This court will not reverse an order denying a motion for continuance for failure to discuss the *McKay* factors when the record reflects that the trial court considered the factors. *Id.* at 243. As explained below, the record supports the trial court's denial of Heath's motions.

First, defense counsel had adequate time to prepare for trial. She had represented Heath for over sixteen months when she moved for a continuance.

Second, Heath failed to show a likelihood of prejudice if the trial court did not continue the trial. Defense counsel first identified a long list of witness she insisted she needed to depose. By the time she moved for a fourth continuance, she had deposed six of the fifteen. Even though defense counsel could not depose every possible witness, she spoke to those she had not deposed before they testified. She then affirmed to the court that she was "satisfied" after speaking to those witnesses.

Third, there is no sign that Heath shorted defense counsel's preparation time. "[T]he right to a preparation period sufficient to assure at least a minimal quality of counsel . . . is not absolute but at some point must bend before countervailing interests involving effective administrative of the courts." *McKay*, 504 So. 2d at 1282.

Fourth, this was a complicated case considering the State presented over twenty witnesses and Heath faced a mandatory life sentence if convicted.

Fifth, discovery was available and adequate. Heath points to two portions of the transcript to show that he did not have all the discovery: (1) when defense counsel could not locate a search

5

warrant in her file, and (2) when defense counsel stated that she just received Heath's certified driving record and vehicle registration from the State. But as to the first incident, defense counsel admitted that Heath's defense was not prejudiced by the lack of the search warrant. And as to the second one, the State used the driving record only to show that Heath was the registered owner of a black Nissan truck. Defense counsel conceded that it was not a surprise that the State had documentation to prove that the truck was registered to Heath.

Last, as to the sixth and seventh factors, nothing in the record reflects that defense counsel was inexperienced, unskilled, or provided ineffective assistance. Indeed, the State argued in its objection to Heath's motion that defense counsel "is an experienced trial attorney with years of experience trying very serious cases for both the State of Florida and as counsel for criminal Defendants . . . ."

When considering the *McKay* factors in the context of the record here, the trial court did not abuse its discretion when it denied the Heath's motion to continue the trial.

*Collateral Crime Evidence*

Heath argues next that the trial court abused its discretion when it allowed the State to admit evidence of past incidents of abuse or violence between him and Webb. We find no abuse of discretion by the trial court because the domestic violence evidence was inextricably intertwined with the charged offenses.

There are two categories of admissible evidence of uncharged crimes: "similar fact evidence and dissimilar fact evidence." *Truehill v. State*, 211 So. 3d 930, 945 (Fla. 2017) (quotations omitted). "Similar fact evidence is governed by the requirements and limitations of section 90.404, and dissimilar fact evidence is governed by the general rule of relevancy set forth in section 90.402." *Victorino v. State*, 23 So. 3d 87, 98–99 (Fla. 2009).

Dissimilar fact evidence is admissible to "establish[] the relevant context in which the [charged] criminal acts occurred." *Caruso v. State*, 645 So. 2d 389, 394 (Fla. 1994). This includes

6

"evidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged . . . ." *Griffin v. State*, 639 So. 2d 966, 968 (Fla. 1994). The evidence is admissible both because it is relevant and because it is an "inseparable part of the act which is in issue . . . . [I]t is necessary to admit the evidence to adequately describe the deed." *Id*. The evidence is admissible because "it is a relevant and inseparable part of the act which is in issue. . . . [I]t is necessary to admit the evidence to adequately describe the deed." *Id.* (quoting Charles W. Ehrhardt, *Florida Evidence* § 404.17 (1993 ed.)).

Dissimilar fact evidence will be considered inextricably intertwined with the charged crime when the evidence is "necessary to (1) 'adequately describe the deed'; (2) provide an intelligent account of the crime(s) charged; (3) establish the entire context out of which the charged crime(s) arose; or (4) adequately described the events leading up to the charged crime(s)." *Richardson v. State*, 338 So. 3d 1106, 1117 (Fla. 1st DCA 2022) (quoting *Macomber v. State*, 254 So. 3d 1098, 1100–01 (Fla. 1st DCA 2018)).

The State is allowed to admit dissimilar fact evidence that "paints an accurate picture of the events surrounding the crimes charged." *Id.* (quoting *Truehill*, 211 So. 3d at 945). Even so, when establishing its case, the State cannot "make the evidence of other crimes the feature of the trial or . . . introduce the evidence solely for the purpose of showing bad character or propensity." *Id*. And thus, dissimilar fact evidence may be excluded if its probative value is substantially outweighed by unfair prejudice. *Id.* at 1118.

In this case, the State sought to introduce evidence about violence between Heath and Webb to establish the motive behind the shooting and Webb's participation. The testimony Heath challenges on appeal includes testimony by Webb and Webb's sister about domestic violence between Heath and Webb. Webb's sister described the relationship between Heath and Webb as tumultuous. She was concerned that Heath would become physically violent with Webb. Webb then testified that she was afraid of Heath because he had hit her; she claimed that Heath

7

headbutted her on the day of the shooting. Webb feared Heath due to his violent nature and felt compelled to follow his instructions.

The testimony by Webb and her sister was properly admitted as dissimilar fact evidence. Evidence of the nature of Webb's relationship with Heath—including the past acts of domestic violence—was inextricably intertwined with the shooting. The evidence was necessary to explain (1) why Webb felt compelled to admit to Heath that she had been in a sexual relationship with D.W., (2) Heath's reaction after learning about that relationship, (3) why Webb agreed to go with Johnson and Heath to D.W.'s home, and (4) why, contrary to Heath's theory, Webb was not the mastermind behind the shooting.

In short, the testimony about domestic violence between Heath and Webb provided context for the events leading to the shooting and explained Webb's involuntary participation in the shooting. The evidence was relevant and properly admitted as dissimilar fact evidence because it was inextricably intertwined with the charged offense. *See Hayes v. State*, 338 So. 3d 1123, 1131 (Fla. 1st DCA 2022) ("Stated another way, the evidence was necessary to establish the entire context out of which the charged crimes arose and adequately describe the events leading up to the charged crimes.").

Finally, the probative value of the evidence outweighed any prejudice to Heath. *See Truehill*, 211 So. 3d at 947 (explaining that when it comes to admission of dissimilar fact evidence, "[e]ven the most heinous and numerous crimes have been allowed as inextricably intertwined and found to have probative value that outweighed prejudice to the defendant"). Because the dissimilar fact evidence was relevant and its probative value outweighed any prejudice to Heath, the trial court did not abuse its discretion when it allowed the State to admit the testimony about Heath's violent relationship with Webb.

We, therefore, AFFIRM Heath's convictions and sentences.

LEWIS and M.K. THOMAS, JJ., concur.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____


Jessica J. Yeary, Public Defender, and Kasey Helms Lacey, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, and Christina Day Piotrowski, Assistant Attorney General, Tallahassee, for Appellee.