DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**WARD L. KENYON,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2023-1856

[December 10, 2025]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; Nicole P. Menz, Judge; L.T. Case No. 312018CF000135A.

Daniel Eisinger, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, West Palm Beach, for appellant.

James Uthmeier, Attorney General, Tallahassee, and Deborah Koenig, Senior Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

This case arose from a melee in a sports bar where police officers tried to serve a violation of probation warrant on the defendant. Many shots were fired, and an officer was shot in the foot by a fellow officer. The defendant represented himself at a jury trial. He was convicted of the three felonies now on appeal.

We affirm the three convictions and the resulting sentences. Although the defendant did a more than competent job representing himself, decisions he made and actions he took during the trial drive this result.

### *The Charges at Trial*

Before trial, Ward Kenyon ("Kenyon" or "the defendant") pleaded no contest to the charge of possession of a firearm by a convicted felon. He

was sentenced to 27 years in prison as a habitual felony offender.[1]  The case went to trial on the charges of altering a firearm serial number, carrying a concealed firearm, and attempted second-degree murder of a law enforcement officer with a firearm and discharge.

### *The Evidence at Trial*[2]

In October 2017, uniformed officers from the Sebastian Police Department went to a sports bar to serve Kenyon with an arrest warrant for violation of probation.  The officers included Officer Singh, Officer Nevue, and Sergeant Garrison.

Officer Singh approached Kenyon inside the crowded, noisy bar.  The officer identified himself as a police officer and asked Kenyon "to come outside to speak with us."  Officers could not tell if Kenyon was armed just by looking at him.  Kenyon became defensive and immediately began moving toward an exit.  As he started to walk away from a large crowd of people into a more open area, Kenyon began to increase his pace.

Kenyon's demeanor changed as he neared a pool table.  He began physically resisting and started to "shoulder" the officers; he also "chest bumped" Officer Nevue.  One of the officers took Kenyon's drink and set it on the pool table.

Kenyon and the officers were positioned between the pool tables and a wall against which leaned plywood sheets.  Officers attempted to place Kenyon's hands behind his back to handcuff him.

Kenyon bent over slightly, doing something near his waistband, and pulled out a firearm.  Officer Singh noticed the firearm and yelled "gun."

Kenyon pointed the gun at Officer Singh, who testified that the barrel of the gun flagged him "[r]ight . . . when it was brandished."  Officer Singh explained: "As it was brandished it was pointing right towards me and then the fight was on for the gun."

---

[1] In a previous appeal, case number 2023-0313, we affirmed this conviction and sentence.

[2] We state the evidence at trial in the light most favorable to the State.  *See, e.g., State v. Lee*, 230 So. 3d 886, 888 (Fla. 4th DCA 2017) (in reviewing the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the State).

Kenyon and Officer Singh struggled over the firearm, with the barrel pointed at the officer's chest. As Sergeant Garrison put it, "the muzzle of [Kenyon's] gun was pointed at Officer Singh and they were struggling over it."

Officer Singh placed both his hands on the gun, trying to push the muzzle downward. Kenyon had his hand on the handle side of the gun, while Officer Singh "was on the muzzle side," with the gun "pointed at his center mass." Officer Singh was losing the struggle and did not have control over Kenyon.

Officer Singh felt resistance as he was pushing the gun down. Kenyon actively tried to bring the gun towards Officer Singh. If Officer Singh had relaxed his grip, the firearm would have been pointed "right at" him. Officer Nevue gave Kenyon a verbal command to drop the gun.

The three officers all testified that Kenyon's firearm discharged during the struggle. Around the time his gun discharged, Kenyon fell on top of Officer Singh, and the plywood boards against the wall fell on top of the two of them. Officer Singh agreed that the firearm was not pointed at him at the moment it discharged. However, even after "a gunshot already had gone off," Kenyon pointed the gun right at Officer Singh's chest.

Officer Singh gave inconsistent answers about whether the gun was discharged while he and Kenyon were still standing, but the video shows that the gunshots began immediately after Kenyon and Officer Singh went to the ground.

A bar patron, called as a defense witness, testified that he had a full view of Kenyon and the officers until Kenyon went to the ground. The witness explained that Kenyon was trying to lead the officers out the back door, but the officers wanted him to stay there, subdued him, and held him against the wall. The witness did not see Kenyon point anything at the officers. The witness heard the first gunshot when Kenyon was on the ground.

Officer Nevue testified that the firearm was in Kenyon's hand but also partially in Officer Singh's hand when it discharged. At that moment, Officer Nevue decided to use deadly force and began firing his weapon. Officer Nevue said that even after he began discharging his firearm, Kenyon "continued to resist" and "continued to push the threat."

Sergeant Garrison explained that Kenyon's firearm discharged once around the same time when Officer Nevue first fired. According to Officer

Nevue, once Kenyon discharged the initial round, Kenyon's firearm "would not discharge a second time."

Officer Singh got up and ran outside, where he realized that he had been shot in the foot. The evidence showed that Officer Singh's injury was "in all likelihood" caused by a fellow officer.

Meanwhile, Kenyon rolled underneath a pool table, where he attempted to "rack the slide" of his firearm to make it operable. Sergeant Garrison explained that Kenyon held a firearm in one hand and placed his other hand on top of it to rerack or clear it. Because Kenyon's "firearm had already been discharged once in Officer Singh's direction," Sergeant Garrison thought Kenyon "was trying to kill Officer Singh." Based on her concern for the safety of the officers and patrons, Sergeant Garrison then fired her weapon as well.

Officer Nevue continued firing until he could see that Kenyon was no longer a threat. After Sergeant Garrison fired twice in Kenyon's direction, Kenyon tossed a gun to the side and rolled out from underneath the pool table to surrender.

Kenyon had been shot several times.

Two firearms belonging to Kenyon were recovered from the scene—a .45 Colt and a 9-millimeter pistol. The 9-millimeter pistol had an obliterated serial number. At trial, the State introduced a business record showing that Kenyon had not applied for or been issued a concealed weapons license.

Cell phones and security cameras captured the incident on video, showing that the entire encounter from the officers' arrival to Kenyon's apprehension lasted less than two minutes. The videos depict a chaotic scene in the bar. A defense expert, Dr. Michael Berkland, concluded that all shots were fired within about 11 seconds.[3]

### *Testimony from Firearm Examiner and Crime Scene Detective*

The State's firearm examiner testified that a .45-caliber projectile found at the scene was fired from the .45 Colt that was also recovered at the

---

[3] Specifically, Dr. Berkland prepared a timeline showing that that all shots were fired between the 13th second and the 24th second of a 24-second window.

scene. He further testified that a .45 casing found at the scene either had been fired from the .45 Colt or had been cycled through it.

The firearm examiner linked 12 casings at the scene to Nevue's firearm and two to Garrison's. Similarly, a sergeant in the Crime Scene Unit testified that Nevue's gun was missing 12 rounds and Garrison's was missing two.

### Kenyon's Recorded Interrogations

The State introduced two recorded interrogations of Kenyon.

In the first, which occurred in the emergency room on the night of the incident, Kenyon said that he did not intend to shoot anybody or have the firearm go off.

In the second, which took place in the hospital two days later, Kenyon admitted that he was in possession of a 9-millimeter and a Colt .45. He later nodded his head "yes" when asked if he scratched the serial number off the gun (i.e., the 9-millimeter). He also reiterated that he did not mean to harm an officer or to hurt anyone. He claimed that he did not know whether his gun (i.e., the Colt .45) had discharged in the bar. He explained that he had never discharged the gun from underneath the pool table, and that he did not know whether the gun had discharged as he was falling to the ground.

In both statements, Kenyon repeatedly claimed that he was trying to get rid of the guns.

### Denial of Motion for Judgment of Acquittal

Kenyon moved for a judgment of acquittal on the attempted second-degree murder charge, arguing that the evidence was insufficient to support the elements of the crime. He maintained that the State failed to prove he acted with malice, hatred, ill will, spite, or an evil intent against Officer Singh, particularly since he did not know Officer Singh. Kenyon also argued that the State failed to prove he committed an imminently dangerous act demonstrating a depraved mind, since the evidence did not show he intentionally pointed a firearm at Officer Singh or intentionally discharged it.

The trial court denied the motion, finding that the State presented sufficient evidence on the attempted second-degree murder charge.

5

### Verdict and Sentence

A six-member jury found Kenyon guilty as charged on all three counts. On the attempted second-degree murder count, the jury made specific findings that Kenyon "actually possessed" and "actually discharged" a firearm. The trial court sentenced Kenyon to 10 years in prison as a habitual felony offender on the altered serial number charge, a concurrent five-year term on the concealed firearm count, and a consecutive life sentence with a 20-year mandatory minimum on the attempted second-degree murder of a law enforcement officer charge. All three counts were consecutive to the previously-imposed 27-year sentence for the felon-in-possession charge.

### The State Presented Sufficient Evidence to Survive Kenyon's Motion for Judgment of Acquittal on the Attempted Second-Degree Murder Charge

*The Defendant's Argument*

Kenyon argues that the trial court erred in denying his motion for judgment of acquittal on the attempted second-degree murder charge. Relying upon *Wiley v. State*, 60 So. 3d 588 (Fla. 4th DCA 2011), where this court found that the conduct of hitting another over the head with a loaded gun amounted to "extremely reckless behavior" but was insufficient to infer malice, Kenyon argues that the evidence here similarly does not support the conviction. He emphasizes that (1) the gun discharged during a struggle in which both he and Officer Singh had their hands on the gun, (2) the record shows no ill will or prior difficulties between Kenyon and Officer Singh, and (3) Kenyon had no reason to shoot Officer Singh, especially in the presence of other officers. In short, Kenyon argues that "[p]ointing a gun at an officer is not attempted murder, nor is the discharge of the gun in a struggle."

*Discussion*

The denial of a motion for judgment of acquittal is reviewed de novo. *Segal v. State*, 98 So. 3d 739, 742 (Fla. 4th DCA 2012). "[A]n appellate court will not reverse a conviction which is supported by competent, substantial evidence." *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002). "In moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." *Petit v. State*, 321 So. 3d 286, 290 (Fla. 4th DCA 2021) (internal quotation marks omitted). A trial court should grant a motion for

judgment of acquittal only if "the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974). "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." *Pagan*, 830 So. 2d at 803. "The fact that the evidence is contradictory does not warrant a judgment of acquittal because the weight of the evidence and the witnesses' credibility are questions solely for the jury." *Fitzpatrick v. State*, 900 So. 2d 495, 508 (Fla. 2005), *abrogated on other grounds by Alahad v. State*, 362 So. 3d 190 (Fla. 2023).

To sustain a conviction for attempted second-degree murder, the State must prove two elements: "(1) the defendant intentionally committed an act that could have resulted, but did not result, in the death of someone, and (2) the act was imminently dangerous to another and demonstrated a depraved mind without regard for human life." *Coissy v. State*, 957 So. 2d 53, 55 (Fla. 4th DCA 2007). Put simply, attempted second-degree murder requires proof of the same conduct and mental state as second-degree murder, but without the completion of the killing. *See Clark v. State*, 207 So. 3d 1019, 1022 (Fla. 4th DCA 2017).

Conduct is considered "imminently dangerous" and demonstrating a "depraved mind" if "it is an act or series of acts" that: (1) "a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another"; (2) "is done from ill will, hatred, spite or an evil intent"; and (3) "is of such a nature that the act itself indicates an indifference to human life." *Wiley*, 60 So. 3d at 591. The term "depraved mind" "has been [] defined as importing malice in the sense of ill will, hatred, or evil intent," *Hines v. State*, 227 So. 2d 334, 335–36 (Fla. 1st DCA 1969), but "this is not to say malice is limited in its meaning to hatred, ill will and malevolence." *Antoine v. State*, 138 So. 3d 1064, 1073 (Fla. 4th DCA 2014) (cleaned up). Instead, "it denotes a wicked and corrupt disregard of the lives and safety of others . . . a failure to appreciate social duty." *Id.* (cleaned up).

The required intent for the depraved-mind element may be inferred from the circumstances. *Kenner v. State*, 208 So. 3d 271, 275 (Fla. 5th DCA 2016). The defendant's intent is typically a jury question. *Larsen v. State*, 485 So. 2d 1372, 1373 (Fla. 1st DCA 1986). Additionally, second-degree murder does not require proof that the defendant intended to kill the victim. *State v. Montgomery*, 39 So. 3d 252, 256 (Fla. 2010).

"Although exceptions exist, the crime of second-degree murder is normally committed by a person who knows the victim and has had time to develop a level of enmity toward the victim." *Light v. State*, 841 So. 2d 623, 626 (Fla. 2d DCA 2003). "Hatred, spite, evil intent, or ill will usually require more than an instant to develop." *Id.* Still, a preexisting relationship between the defendant and the victim is not necessarily required to sustain a conviction for second-degree murder. *See, e.g.*, *Hoefert v. State*, 617 So. 2d 1046, 1047–50 (Fla. 1993); *Bega v. State*, 100 So. 2d 455, 457 (Fla. 2d DCA 1958). Although preexisting enmity between a defendant and a victim may be the most common way to establish ill will, such a previous connection is not necessary if the defendant's actions evince the requisite malice and disregard for life under Florida law.

The State relies on cases holding that the defendant's discharge of a gun constitutes an act imminently dangerous to another and evincing a depraved mind, but those cases are factually dissimilar to this one, in that they involved defendants who pointed a firearm directly at the victim and fired it; none of the State's cases involved a struggle over the gun. *See Gibbs v. State*, 904 So. 2d 432, 435 (Fla. 4th DCA 2005) (holding that pointing a gun at the victim and then firing constituted an imminently dangerous act evincing a depraved mind); *Edwards v. State*, 302 So. 2d 479, 481 (Fla. 3d DCA 1974) (finding defendant's act of pointing the gun at the victim's head and then firing to be imminently dangerous to another and evincing a depraved mind); *Dellinger v. State*, 495 So. 2d 197, 198–99 (Fla. 5th DCA 1986) (finding defendant's act of pointing rifle at wife without knowing whether it was loaded and pulling trigger was sufficient to demonstrate depraved mind); *Mackey v. State*, 277 So. 3d 762, 768–69 (Fla. 1st DCA 2019) (finding sufficient evidence to support second-degree murder conviction where defendant pressed the gun against his ex-wife's head and killed her with a single shot); *see also State v. Bryan*, 287 So. 2d 73, 76 (Fla. 1973) (in an appeal involving jury instructions, stating that the intentional striking of another, in anger, with a loaded pistol—where the weapon discharged and killed the victim—constituted an act imminently dangerous to another and evincing a depraved mind).

Kenyon relies on cases that are distinguishable from this one, as they involve facts leaning to the less culpable, "mere recklessness" side of the second-degree murder equation. For example, in *Wiley*, we held that the evidence was insufficient to show a depraved mind where defendant struck his sister's boyfriend in the head with a loaded gun, causing it to discharge and kill a bystander. 60 So. 3d at 591–92. We observed that given the previously friendly relationship between the defendant and the boyfriend, the defendant's conduct "was less a result of malice and more of extremely

reckless behavior, which is insufficient from which to infer any malice." *Id.* at 592; *see also Dorsey v. State*, 74 So. 3d 521, 522 (Fla. 4th DCA 2011) (holding evidence insufficient to support second-degree murder where defendant shot two people as an "impulsive overreaction" to being attacked at a keg party).

*Burns v. State*, 584 So. 2d 1073 (Fla. 4th DCA 1991), presents a fact situation close to the melee in this case. In *Burns*, we held that the evidence was sufficient to sustain a conviction for attempted second-degree murder where the defendant, after struggling with police, picked up an officer's dropped gun and pointed it "at that officer while making a motion to squeeze the trigger." *Id.* at 1074, 1076. Although the defendant made a statement admitting that he shot the officer, the police later discovered that the officer was actually injured by a bullet fired from a fellow officer's gun. *Id.* at 1074.

In affirming the conviction, we emphasized that Florida's attempt statute encompasses "any act" toward the commission of the crime. *Id.* at 1076. We further explained that "[w]*ielding and pointing a handgun at someone is an act teeming with consequences and is reasonably understood as an act toward the commission of murder.*" *Id.* (emphasis supplied). We added: "Indeed we can think of few single acts more calculated to advance an enterprise in murder or violence." *Id.*

Here, the trial court properly denied Kenyon's motion for judgment of acquittal because the evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to find all the elements of attempted second-degree murder. Kenyon's behavior—brandishing a firearm, pointing it directly at Officer Singh's torso, and engaging in a violent struggle for the weapon that resulted in its discharge—constituted acts imminently dangerous to another and demonstrating a depraved mind without regard for human life. As in *Burns,* Kenyon's conduct of wielding and pointing a firearm at a police officer is reasonably understood as an act toward the commission of murder. Kenyon also actively attempted to bring the gun toward Officer Singh's body mass as they were struggling for control of the weapon. That the firearm discharged during the struggle underscores the imminently dangerous nature of Kenyon's actions, even if the firearm was not pointed at Officer Singh at the exact moment of discharge.

The criminal conduct in this case went beyond the "extremely reckless" behavior at issue in *Wiley*. A jury could reasonably find that Kenyon committed acts that a person of ordinary judgment would know were reasonably certain to kill or do serious bodily injury to another, were done

9

from "ill will, hatred, spite or an evil intent," and which indicated an indifference to human life. Despite being in a crowded bar, confronted by multiple uniformed officers, Kenyon pointed the loaded gun at Officer Singh, resisted the officer's efforts to disarm him, tried to bring the gun toward the officer's torso, engaged in a struggle that resulted in the discharge of his weapon, and then attempted to rerack the firearm to make it operational again. The attempt to rerack the firearm is probative of Kenyon's mental state during the earlier free-for-all, providing further evidence that he harbored the requisite ill will, hatred, or evil intent to support the charge of attempted second-degree murder. Kenyon's interpretations of the evidence are valid jury arguments, but all conflicts in the evidence, and reasonable inferences to be drawn from the evidence, are resolved in favor of the verdict.

### *The Trial Court Did Not Abuse Its Discretion in Allowing the State to Offer Kenyon's Statements to the Court on the Motion for Judgment of Acquittal and a Phone Call Made from the Jail*

After Kenyon rested his case, the prosecution reopened its case and introduced two additional recorded statements Kenyon made: one during his argument on his motion for judgment of acquittal, outside the presence of the jury, and the other during a jail call discussing that motion.

In the recorded statement from the motion for judgment of acquittal, Kenyon stated:

> I didn't indicate to do any harm to the officers cause I didn't. I panicked. I had guns on me, I was in a bar. Now, the jury's not here, we all know why I was trying to get rid of 'em, I panicked, I tried to run, I was gonna get rid of 'em and run. In fact these officers say I have a known reputation for running. That's what the defendant was trying to do.

In the call from the jail, Kenyon referred to his argument on the motion for judgment of acquittal:

> Ya' know, I mention how the jury wasn't there. I said everybody here knows, ya' know and what I mean by that is that I was trying to run just to get rid of what I had on my person, not hurt anybody.

Kenyon objected to the admission of the statements. He maintained that the statements were cumulative, irrelevant, and unfairly prejudicial

10

under section 90.403, Florida Statutes, particularly due to the reference to the jury's absence, which he argued would lead the jury to believe he was hiding something from them. Kenyon also asserted that his statement in the motion for judgment of acquittal was legal argument and was not testimonial.

We pause to note that Kenyon did not raise the objection that allowing the introduction of the statements violated his Sixth Amendment right to conduct his own defense under *Faretta v. California*, 422 U.S. 806 (1975). Nor did Kenyon raise the issue in his briefing with this court. Because the issue has been neither preserved nor briefed, and because any error is not fundamental, we decline to reach this issue here, confining our concerns to the footnote below.[4]

The trial court concluded that Kenyon's statement on the motion for judgment of acquittal was a "humongous admission" and overruled his objections.

On appeal, Kenyon argues relevance—that the statements "did not go to any disputed material fact"—and that any probative value of the statements was substantially outweighed by the danger of unfair prejudice under section 90.403, Florida Statutes (2023).

*Discussion*

A trial court's rulings on the relevance of evidence and the application of section 90.403's balancing test are reviewed for an abuse of discretion. *State v. Hubbs*, 377 So. 3d 1162, 1165 (Fla. 4th DCA 2023). A trial court

---

[4] The impeachment of a *Faretta* defendant by that defendant's arguments to the court, outside the presence of the jury, appears to present a significant Sixth Amendment issue. In considering the parameters of stand-by counsel under *Faretta*, the Supreme Court wrote that "*Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to address the court freely on his own behalf." *McKaskle v. Wiggins*, 465 U.S. 168, 179 (1984). The Court observed that outside the presence of the jury, the defendant in *Wiggins* "was given ample opportunity to present his own position to the court on every matter discussed. He was given time to think matters over, to explain his problems and concerns informally, and to speak to the judge off the record." *Id.* at 181. Similarly, the Second Circuit has emphasized that "to avoid any ambiguity in the jury's mind about the unsworn statements of a pro se defendant, it should be made clear to the jury at the outset that anything he says in his 'lawyer' role is not evidence against him or a co-defendant, and his remarks are to be regarded no differently than those of the attorneys in the case." *United States v. Sacco*, 563 F.2d 552, 557 (2d Cir. 1977).

abuses its discretion only when its action "is arbitrary, fanciful, or unreasonable," meaning no reasonable person "would take the view adopted by the trial court." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980).

"Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2023). All relevant evidence is admissible unless otherwise provided by law. *State v. McClain*, 525 So. 2d 420, 421 (Fla. 1988). Section 90.403 precludes otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2023).

In applying section 90.403, the trial judge has "a large measure of discretion" to decide "whether the probative value of the evidence is substantially outweighed by any of the enumerated reasons." *McClain*, 525 So. 2d at 422 (quoting 1 C. Ehrhardt, *Florida Evidence* § 403.1 at 100–03 (2d ed. 1984)). Exclusion of evidence under section 90.403 "is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *State v. Gerry*, 855 So. 2d 157, 163 (Fla. 5th DCA 2003) (quoting *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984)).

If evidence tends to prove or disprove a material fact in a case, it is inherently prejudicial to the opposing party. *See United States v. Horner*, 853 F.3d 1201, 1214 (11th Cir. 2017). In a criminal case, the term "unfair prejudice" refers "to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). "Examples of that type of evidence include testimony that a defendant was arrested in a high crime area, general behavior of drug dealers, racial slurs, traffic citations, a party's financial status, evidence of drug use and the criminal history of a defendant." *Gerry*, 855 So. 2d at 160. The party seeking exclusion bears the burden of demonstrating that the danger of unfair prejudice substantially outweighs the probative value of the evidence. *Datus v. State*, 126 So. 3d 363, 365 (Fla. 4th DCA 2013).

Here, the trial court did not abuse its discretion in admitting Kenyon's statements made during his motion for judgment of acquittal and in his jail call because the statements were relevant to material facts in dispute and their probative value was not substantially outweighed by unfair prejudice.

The trial court did not abuse its discretion in finding the statements relevant under section 90.401. In the statements, Kenyon acknowledged possessing guns, trying to get rid of the guns, and attempting to run from police. Those admissions went directly to issues central to the charges, including knowledge, intent, and consciousness of guilt. Kenyon had not admitted guilt to all the charges, so those issues were still in dispute. The statements were particularly probative as to the charges of carrying a concealed firearm and altering a firearm serial number. Kenyon's admissions demonstrated his knowledge that he should not have had the guns. And even if Kenyon's knowledge that he was not allowed to have the guns was "undisputed" in the sense that he had already indicated such knowledge in his police interrogations, his admissions in the JOA motion and the jail call also demonstrated his willingness to break the law to avoid getting caught. This had some probative value to the "depraved mind" element of attempted second-degree murder, even if he claimed he did not intend to harm the officers. The "depraved mind" element of attempted second-degree murder was undoubtedly a disputed issue.

Also, the probative value of the statements was not substantially outweighed by the danger of unfair prejudice under section 90.403. The reference to the jury's absence was not irrelevant and was not unfairly prejudicial. Rather, it provided context for the candor with which Kenyon spoke, and this context was necessary to fully understand the scope of the admission. While Kenyon argues the jurors might have inferred from the statements that he was "hiding" something by noting their absence, the record does not support a conclusion that this reference was inflammatory or misleading in a way that would lure the jury into convicting on an improper basis.

Contrary to Kenyon's argument, the statements did not necessarily show that he was a convicted felon, as they instead could have referred to the unlawful concealment or the altered serial number. The reference to the jury's absence did not suggest propensity evidence, slurs, or other inherently inflammatory content typical of unfairly prejudicial evidence.

Although Kenyon contends that the evidence was cumulative, cumulativeness alone is not a sufficient ground to exclude evidence. *Samiian v. Johnson*, 302 So. 3d 966, 982 (Fla. 1st DCA 2020). A defendant's own words have significant probative value. The trial court properly balanced the section 90.403 factors and concluded that the probative value of the evidence was not *substantially* outweighed by the danger of unfair prejudice.

13

### *Kenyon Opened the Door to Testimony that the Officers Were at the Bar to Serve a VOP Warrant*

Prior to trial, Kenyon moved to redact references to the VOP warrant from the police statements, and the prosecutor agreed to the redaction. The prosecutor instructed all State witnesses to refer to the interaction between Kenyon and the officers as an "investigation."

On direct examination, Officer Singh testified that he and other officers went to the bar in response to an investigation and approached Kenyon inside the bar. Officer Singh was in uniform and identified himself as a police officer. He requested Kenyon to walk outside to speak with him because the bar was loud and he wanted to give Kenyon privacy to discuss the investigation. After being approached, Kenyon acknowledged Officer Singh's presence and began walking toward the door with the officers. As they moved toward the exit, Kenyon "cut away" from the officer. During this movement, Kenyon's demeanor changed, and he began showing signs of aggression.

On cross-examination, Kenyon's questions focused on the beginning of his interaction with Officer Singh, attempting to show that he had complied with the officers' requests. Kenyon asked whether Officer Singh had commanded or merely requested Kenyon to leave the bar, and Officer Singh reiterated that he had requested Kenyon to step outside for privacy to speak about the investigation. Kenyon pursued a lengthy, detailed line of questioning about (1) when and how the officers grabbed him during the encounter, (2) the difference between a question and a command, (3) the distinction between a citizen's consensual and nonconsensual encounter with law enforcement, and (4) that a citizen is free to leave a consensual encounter.

At this point, the trial court ruled that Kenyon had opened an evidentiary door and allowed the prosecutor to establish through Officer Singh that the officers were at the bar to serve Kenyon a warrant for violation of probation. This fact was reiterated on Kenyon's recross examination and again on the prosecutor's second redirect.

"As an evidentiary principle, the concept of 'opening the door' allows the admission of otherwise inadmissible testimony to 'qualify, explain, or limit' testimony or evidence previously admitted." *Rodriguez v. State*, 753 So. 2d 29, 42 (Fla. 2000) (citations omitted). The doctrine is founded "on considerations of fairness and the truth-seeking function of a trial." *Id.* (quoting *Bozeman v. State*, 698 So. 2d 629, 631 (Fla. 4th DCA 1997)). However, "[t]he mere fact that testimony may be characterized as

incomplete or misleading does not *automatically* trigger the admission of otherwise inadmissible evidence under the opening the door principle." *Brown v. State*, 294 So. 3d 367, 372 (Fla. 4th DCA 2020). "Rather, the State must demonstrate a legitimate need to resort to such evidence to correct a false impression." *Redd v. State*, 49 So. 3d 329, 333 (Fla. 1st DCA 2010). Otherwise, the rule "threatens to become a pretext for the illegitimate use of inadmissible evidence, and the fairness-promoting purpose of the rule is lost." *Id.*

Here, the trial court did not abuse its discretion by admitting evidence related to the VOP arrest warrant because Kenyon opened the door to the testimony.

One of the elements of attempted second-degree murder of a law enforcement officer is that the officer was "engaged in the lawful performance of a legal duty." § 782.065(2), Fla. Stat. (2017). By exhaustively questioning whether Officer Singh issued a "command" or merely a "request," and by eliciting testimony about the legal difference between consensual and nonconsensual encounters, Kenyon created the misleading impression that the officers may not have been engaged in the lawful performance of a legal duty. He suggested that his interaction with Officer Singh was a consensual encounter where he could lawfully refuse to participate and walk away.

But a citizen confronted with an outstanding arrest warrant does not have the free choice to walk away. The State properly rebutted the misleading impression by introducing evidence establishing the officers' lawful purpose for confronting Kenyon. There had been no stipulation by the defense that the officers had been engaged in the lawful performance of a legal duty,[5] so the evidence was relevant to a material issue in the case.

### *The Trial Court Erred in Allowing the Impeachment of a Defense Expert Witness by Prior Bad Acts, But the Error was Harmless*

Dr. Berkland, who taught classes in shooting reconstruction, testified for the defense as an expert witness. He was a former medical examiner

---

[5] Although Kenyon stated at one point that he was "conceding and stipulating" that the officers "were there for an investigative purpose," this statement was made outside the jury's presence in an argument to the judge. The jury never heard any stipulation from Kenyon that Officer Singh was "engaged in the lawful performance of a legal duty."

15

who had completed a pathology residency. However, his expert testimony had nothing to do with either medicine or pathology. The bulk of his testimony pertained to a reconstruction of the shooting from acoustic analysis. A small portion of his testimony related to the evidence handling techniques of the police.

On direct examination, Dr. Berkland described a spectral acoustic analysis he had conducted of two cellphone videos, which together captured the audio of the incident except for a 2.8-second gap when Kenyon was "either under the pool table or rolling toward the pool table."

Dr. Berkland detected 16 "loud anomalies" consistent with apparent gun discharges. Dr. Berkland opined that all 16 discharges of firearms "appear to be from the officers." Dr. Berkland testified that a Colt .45 is louder than the other guns at issue, and that he did not find "an acoustic signature of a .45 going off." Dr. Berkland also testified that the police did not follow proper procedures for handling the crime scene evidence. For example, he noted that "one of the bags was . . . open and had not been resealed," and that a projectile was "roaming loose in the sack."

Prior to cross-examination, the State sought a ruling on whether it could question Dr. Berkland about being fired from an out-of-state medical examiner position and being prosecuted for tampering with evidence in Florida. The State pointed out that Dr. Berkland had testified about proper evidence collection practices and held himself out as an expert in that field despite having been prosecuted for improper collection of evidence during autopsies. The State clarified that it did not intend to reference the case as a conviction but rather to ask whether Dr. Berkland had been accused of tampering with evidence, which led to a deferred prosecution agreement and termination of employment.

Kenyon objected to the proposed impeachment. Among other things, Kenyon maintained that "you cannot impeach somebody with a mere allegation of . . . prior bad acts," and distinguished this case from a situation where an expert made "false entries" on a curriculum vitae ("C.V."), which Dr. Berkland had not done here. Kenyon further asserted that allowing the questions would result in "unfair prejudice" and "mislead the jury," particularly because Dr. Berkland's alleged misconduct was unrelated to firearms testimony, such that "the probative value is substantially outweighed by the danger of unfair prejudice" under the balancing test of section 90.403.

The trial court overruled Kenyon's objection and allowed the proposed impeachment, except for the mention of a pretrial diversion program.

16

During cross-examination, Dr. Berkland confirmed that he had been fired from a Missouri medical examiner's office and that his Missouri medical license had been revoked. When asked if he was "investigated for improper collection of evidence" in Florida, Dr. Berkland answered that the investigation pertained to private evidence he had in his possession, not medical examiner evidence. Dr. Berkland admitted that "subsequent to that investigation" he was "no longer employed by the Medical Examiner's Office in Pensacola."

*Discussion*

The trial court erred by allowing Dr. Berkland to be impeached by prior bad acts.

A party may attack the credibility of a witness by, among other things, "[a]ttacking the character of the witness in accordance with the provisions of s. 90.609 or s. 90.610." § 90.608(3), Fla. Stat. (2023). Section 90.609 allows a party to attack the credibility of a witness by evidence in the form of reputation, but the "evidence may refer only to character relating to truthfulness." § 90.609(1), Fla. Stat. (2023). And section 90.610 allows a party to attack the credibility of a witness by evidence that the witness has been convicted of a felony or a crime involving dishonesty or a false statement. § 90.610(1), Fla. Stat. (2023).

"Evidence of particular acts of misconduct cannot be introduced to impeach the credibility of a witness." *Farinas v. State*, 569 So. 2d 425, 429 (Fla. 1990); *see also Pantoja v. State*, 59 So. 3d 1092, 1096 (Fla. 2011) (prohibiting impeachment evidence of "particular acts of ethical misconduct"); *Jackson v. State*, 545 So. 2d 260, 264 (Fla. 1989) (holding that "general acts of misconduct," such as a "police department reprimand" are not proper impeachment); *Aaron v. State*, 345 So. 2d 641, 644 n.10 (Fla. 1977) (stating that "[g]enerally, a witness may not be impeached by evidence of prior acts of misconduct where there has been no conviction").[6]

---

[6] We note that Federal Rule of Evidence 608(b) permits the use of specific instances of misconduct as a method of impeachment under certain circumstances. Professor Ehrhardt explains that the drafters of the Florida Evidence Code "specifically intended not to adopt provision similar to Federal Rule 608(b) because it did not reflect the existing Florida law and because they felt the possibility for abuse of this type of evidence was great." Charles W. Ehrhardt, *Florida Evidence* § 610.8 (2012 ed.).

"Counsel may therefore not make inquiries on cross-examination about unethical conduct on the part of expert witnesses, or disciplinary actions in their profession." *In re Commitment of DeBolt*, 19 So. 3d 335, 337 (Fla. 2d DCA 2009) (internal citation omitted). For example, in *DeBolt*, the Second District held that the trial court abused its discretion by allowing an expert witness in a Jimmy Ryce case to be impeached with evidence that he had been "formally disciplined and received a four-year restriction on [his] license as a sex offender treatment provider for adolescent sex offenders." *Id.*

Similarly, in *Tormey v. Trout*, 748 So. 2d 303, 305–06 (Fla. 4th DCA 1999), we held that a defense medical expert in a civil case was improperly impeached on cross-examination where he was questioned about administrative discipline he received for his misinterpretation of an MRI, and about accusations of "gross or repeated malpractice." Even though the expert had given "a somewhat extensive overview of his qualifications" on direct examination, we found the impeachment improper. *Id.* at 305.

Some latitude is allowed in the cross-examination of experts regarding their qualifications to give expert opinions. Such cross-examination may involve "any matter about which the expert testifies in establishing his or her qualifications, both as a basis of arguing that the witness is not qualified as an expert and to argue that even if he or she is qualified, the jury should not give the opinion testimony great weight." *Flores v. Miami Dade Cnty.*, 787 So. 2d 955, 957 (Fla. 3d DCA 2001) (quoting Charles W. Ehrhardt, *Florida Evidence* § 702.5, at 601–03 (2001)).

In *Farrell v. State*, 186 So. 3d 1046, 1051–52 (Fla. 4th DCA 2015), we allowed cross-examination of an expert regarding iterations of his C.V. that he had compiled prior to trial. We held that the trial court did not abuse its discretion in allowing the State to cross-examine a defense expert about prior versions of his C.V. in which he listed job titles he never officially held, concluding that "[s]uch questioning was 'germane to the matters brought out on direct examination,' because appellant's counsel asked [the witness] about his professional experience and credentials for testifying as an expert." *Id.* at 1052. We thus reasoned that "[t]he state was entitled to cross-examine [the witness] regarding his qualifications as they related to his credibility as an expert." *Id.*

*Farrell* is best understood not as an injection of prior bad acts impeachment into Florida law, but as a case allowing impeachment of an expert by prior inconsistent statements made in a C.V. pertaining to his expertise.

18

In this case, the trial court abused its discretion by permitting the State to impeach Dr. Berkland with evidence that he had been terminated from medical examiner positions, had lost his Missouri medical license, and had been investigated for improper collection of evidence. This impeachment constituted improper use of bad acts of professional misconduct and veered into an impermissible character attack, contrary to sections 90.609 and 90.610 of the Florida Evidence Code and the *Farinas/DeBolt/Tormey* line of cases.

Additionally, unlike cases that allow cross-examination about "any matter about which the expert testifies in establishing" his qualifications, *Flores*, 787 So. 2d at 957, the impeachment here covered an area of expertise that had nothing to do with the bulk of the expert's testimony. Dr. Berkland primarily testified to a reconstruction of the shooting from acoustic analysis, so his missteps as a medical examiner did not pertain to the subject matter of his testimony. And the matters concerning the improper collection of evidence were akin to the administrative discipline a defense medical expert experienced in *Tormey*, and were similarly inadmissible. *See Tormey*, 748 So. 2d at 305–06.

Where error occurs in a criminal case, the State bears the burden of proving the error was harmless beyond a reasonable doubt. *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). The focus of harmless error analysis is "the effect of the error on the trier-of-fact," and the question is whether there is a "reasonable possibility that the error affected the verdict." *Id.* at 1139.

The improper impeachment of the expert had no impact at all on the two firearms convictions, so the error is harmless as to them.

The error was also harmless as to the attempted second-degree murder conviction. There was abundant video and other evidence that Kenyon had engaged in dangerous conduct. As to Count 3 on the verdict form,[7] the jury was asked to evaluate only the attempted second-degree murder charge because, as we explain below, Kenyon declined all lesser-included offense instructions, such as attempted manslaughter.

The actual impeachment of Dr. Berkland about his employment and evidence handling mishaps consisted of only a few questions, so it was brief and isolated, comprising an insignificant part of the long trial and Dr. Berkland's lengthy testimony. The questions were isolated in scope and the trial court minimized the prejudice by prohibiting any reference to a

---

[7] Count 3 on the verdict form was Count 5 of the third amended information.

deferred prosecution agreement. Dr. Berkland's testimony spanned multiple days, and the vast majority of his testimony pertained to shooting reconstruction from acoustic analysis, rather than medical testimony or proper evidence-handling practices.

### *The Trial Court Did Not Err in Denying the Motion to Dismiss the Attempted Murder Charge of the Third Amended Information on Statute of Limitations Grounds*

Attempted second-degree murder of a law enforcement officer with a firearm is a first-degree felony, subject to a four-year statute of limitations. *See* §§ 782.04(2), 777.04(4)(b), 775.087(1)(b), 775.15(2)(a), 782.065(2), Fla. Stat. (2017). Because the offense here occurred on October 9, 2017, the limitations period expired on October 9, 2021.

The original information was filed within the limitations period and included a count charging Kenyon with attempted second-degree murder of a law enforcement officer "on or about October 9, 2017." The first amended information was filed within the limitations period, alleging the same date of the attempted second-degree murder offense and adding firearm allegations.

The second amended information was filed outside the limitations period, altering the attempted second-degree murder count to allege that the crime occurred on or about October 9, 2017 "on one or more occasion [sic]." Specifically, for an unexplained reason, the count read that "on or about October 9, 2017, Ward Lawrence Kenyon did *on one or more occasion* unlawfully, by an act imminently dangerous to another and evincing a depraved mind regardless of human life, . . . attempt to kill and murder [Officer Singh] . . . ." (Italics supplied). Other than adding the phrase "on one or more occasion," the language of that charge remained the same.

The third amended information was filed outside the limitations period; it removed the phrase "on one or more occasion" from the attempted second-degree murder count and returned the charge to the language used in the first amended information.

Kenyon moved to dismiss the attempted second-degree murder charge on statute of limitations grounds, arguing that the inclusion of the "on one or more occasion" phrase in the second amended information substantively broadened the charge and severed the relation-back link to the timely-filed informations. The trial court denied the motion.

On appeal, Kenyon argues that the trial court erred in denying his motion to dismiss because the attempted murder charge in the second-amended information substantively broadened the timely attempted murder charge by including an improper and duplicitous allegation that the crime occurred "on one or more occasion," thereby breaking the relation-back link such that "the untimely attempted murder charge in the third amended information could not reinstate the original timely charge."

*Discussion*

The standard of review of a trial court's denial of a motion to dismiss based on the statute of limitations is de novo. *Morreale v. State*, 382 So. 3d 796, 797 (Fla. 5th DCA 2024).

"The sole purpose of a statute of limitations in the criminal context is to prevent the State from hampering defense preparation by delaying prosecution until a point in time when its evidence is stale and defense witnesses have died, disappeared or otherwise become unavailable." *State v. Garofalo*, 453 So. 2d 905, 906 (Fla. 4th DCA 1984). Because "one who has been squarely put on notice of criminal activities with which he is charged is in a position to begin preparation of a defense on those charges, courts have traditionally held that a valid indictment tolls the statute of limitations[.]" *Id.*

"An information containing an inaccuracy or imperfection, which is timely filed within the period of limitations, is also sufficient to toll [the] statute of limitations." *Rubin v. State*, 390 So. 2d 322, 324 (Fla. 1980). "Courts should uphold indictments and informations if they are in substantial compliance with the statutory requirements." *Price v. State*, 995 So. 2d 401, 405 (Fla. 2008).

"A superseding indictment brought after the statute of limitations has expired is valid so long as the original indictment is still pending and was timely and the superseding indictment does not broaden or substantially amend the original charges." *State v. Bonawitz*, 997 So. 2d 460, 462 (Fla. 4th DCA 2008) (cleaned up). "A subsequently filed information, which contains language indicating that it is a continuation of the same prosecution, timely commenced will not be considered an abandonment of the first information and therefore will not be barred by the statute of limitations." *Rubin*, 390 So. 2d at 324.

For example, in *Rubin*, the Florida Supreme Court held that a second information filed outside the statute of limitations as a "Refile of Case No. 77-4257" was sufficient to link the second information back to the original,

21

timely-filed information. *Id.* *Rubin* further held that "the second information which was filed solely to correct the inaccuracy in the name of the corporation did not commence a new and distinct prosecution." *Id.*

Consistent with these principles, our supreme court has held that the State may amend the charging document to correct a clerical-type error "after the applicable statutory period has elapsed, provided that the amendment was not intended to actually change the substantive charge and did not prejudice the rights of the accused to present a defense and get a fair trial." *M.F. v. State*, 583 So. 2d 1383, 1386 (Fla. 1991). Thus, in *M.F.,* our supreme court ruled that the State could amend a timely-filed delinquency petition after the expiration of the filing period by changing the allegation from sale of cannabis to sale of cocaine. *Id.* at 1384; *see also Rubin*, 390 So. 2d at 324 (upholding amendment correcting the name of the corporate victim).

Conversely, where the State abandons its original charging document by filing an intervening information that is "[t]o all appearances . . . a brand-new charge" with different dates and allegations, a final information that is identical to the original will be treated as "an attempt to revive the original" rather than as an amendment, and the linkage between the original and final charging documents will be broken, preventing relation back for statute of limitations purposes. *Mead v. State*, 101 So. 2d 373, 374–75 (Fla. 1958). *Mead* held that although the original information was timely filed, the defendant's conviction for grand larceny was barred by the statute of limitations where the second information was "[t]o all appearances . . . a brand-new charge" alleging different dates and amounts of stolen copper than the original. *Id.* at 374. Moreover, the untimely third information, which was "identical with the first count of the original information," was merely "an attempt to revive the original" after it had been "abandoned," such that "there was nothing in the last information to link it with the first." *Id.* at 374–75.

The question before us is whether the second amended information's addition of the phrase "on one or more occasion" broadened the attempted second-degree murder count by rendering it "duplicitous."

"An information is duplicitous when it joins two or more separate offenses, or alternative means of committing the same offense, into a single count." *Saldana v. State*, 980 So. 2d 1220, 1221 n.1 (Fla. 2d DCA 2008). Thus, an allegation within a single count that an act occurred on "one or more occasions" may, but does not necessarily, render the count duplicitous. For example, in the context of ongoing sexual abuse of a child, we have held that "where the child is unable to remember the specific dates

on which he or she was abused, the allegation that the act occurred 'on one or more occasions' is not, per se, duplicitous." *State v. Generazio*, 691 So. 2d 609, 611 (Fla. 4th DCA 1997).

Also, a count is not duplicitous "if the acts charged constitute a continuous crime, or a continuous course of conduct, or continuous acts." 41 Am. Jur. 2d *Indictments and Informations* § 198 (footnotes omitted). For instance, in *Cherfrere v. State*, 277 So. 3d 611, 615 (Fla. 4th DCA 2019), we held that the defendant's acts of ramming the victim's car and stabbing her with a knife or machete were committed during a single criminal episode, and thus could be properly charged as "alternative or disjunctive allegations" in one count of attempted murder, particularly where the defendant "would have likely raised a double jeopardy or merger challenge if the State had charged him with two counts of attempted murder."

Here, the trial court properly denied the motion to dismiss the attempted second-degree murder charge because the second amended information did not broaden or substantially amend the original charge in the timely-filed first amended information, and thus the relation-back doctrine preserves the timeliness of the prosecution. The inclusion of the phrase "on one or more occasion" in the second amended information was, at most, an inexplicable imperfection that did not transform the charge into a duplicitous or substantively broader allegation.

Contrary to Kenyon's argument, an allegation of criminal conduct occurring "on one or more occasion" was not inherently duplicitous where, as here, the offense arose from a continuous criminal episode. Attempted second-degree murder can be committed by an act or a series of acts. *Wiley*, 60 So. 3d at 591. The violent confrontation in this case involved a series of acts imminently dangerous to life, including repeatedly pointing a firearm at an officer and engaging in a struggle for control of the firearm. Kenyon's conduct could reasonably be understood as a series of connected acts within a single criminal transaction. Although charging such conduct using "on one or more occasion" could be taken to refer to conduct occurring on different days, when read in context of this case the language attempted to capture the ongoing nature of Kenyon's "depraved mind" conduct without improperly charging multiple offenses in a single count.

Where acts are part of a continuous course of conduct, they may be charged in a single count, particularly when the defendant could raise double jeopardy or merger objections if charged in separate counts. The "on one or more occasion" phrase did not expand the temporal or factual scope beyond the original allegation of conduct on October 9, 2017.

23

Therefore, the phrase did not alter the substance of the charge and cannot be deemed a substantial amendment for statute of limitations purposes.

This case is distinguishable from *Mead*, where the linkage between the timely and untimely charging documents was severed by the State's abandonment of the original information in favor of a second information alleging a "brand-new charge" with different dates and conduct. Here, no such abandonment occurred. The second amended information was not an intervening charging document with allegations of a different date or different underlying facts that would break the linkage between the first amended information and the third amended information. The second amended information merely used slightly different phrasing to charge substantively the same offense as the first amended information.

Significantly, all successive informations were filed in the same case, bore the same case number, and maintained identical core allegations regarding the date, the victim's identity, and the nature of the offense. This indicates a continuation of the same ongoing prosecution rather than a new or revived one. Under *Rubin*, where the State corrects a non-substantive glitch in a later-filed information but demonstrates a continuation of the same prosecution under the same case number, the amendment does not constitute a new prosecution and therefore relates back to a timely-filed charge. At bar, the third amended information simply restored the first amended information's phrasing, effectively curing the confusion generated by the allegedly "duplicitous" language of the second amended information.

### The Trial Court Did Not Commit Reversible Error by Its Handling of Lesser-Included Offenses to the Attempted Second-Degree Murder Charge

Kenyon objected to the inclusion of attempted manslaughter of a law enforcement officer and attempted aggravated battery on a law enforcement officer as lesser-included offenses of attempted second-degree murder, asserting that those charges were time barred under the statute of limitations. However, he requested instructions for the lesser-included offenses of attempted battery and aggravated assault, confirming that he was willing to waive the limitations defense for those offenses.

The State maintained that Kenyon could not selectively waive the limitations defense, arguing that the waiver had to be all or nothing.[8] The

_____

[8] We note that the State is entitled to have the jury charged on a permissive lesser-included offense, even over a defendant's objection. *See State v. Johnson,*

trial court ruled that appellant was entitled to waive the statute of limitations, but he could not selectively waive the limitations defense for some lesser-included offenses while maintaining it for others.

As a result, Kenyon declined *all* lesser-included offense instructions for attempted second-degree murder.

On appeal, Kenyon argues that the trial court erred by forcing him to choose instructions on lesser-included offenses on an all-or-none basis, claiming that he had the right to waive his limitations defenses to lesser-included offenses, and that the relevant case law does not authorize "forcing the defendant into the all-or-nothing option as the trial court did here."

*Discussion*

The issue of whether a trial court is required to accept a defendant's waiver of a statute-of-limitations defense is reviewed de novo. *Maclean v. State*, 291 So. 3d 589, 590 (Fla. 4th DCA 2020).

The trial court properly told Kenyon that he could not use a statute-of-limitations objection to cherry pick the lesser-included offenses to be charged to the jury. Therefore, Kenyon's election to have the court instruct the jury on no lesser offenses to attempted second-degree murder was free and voluntary.

A defendant who *successfully* asserts the statute of limitations to bar some offenses occurring out of a criminal episode cannot then waive the statute of limitations to have the jury instructed on other lesser-included offenses. *Cartagena v. State*, 125 So. 3d 919, 921 (Fla. 4th DCA 2013). Where "lesser-included offenses are barred by the statute of limitations, the trial court does not err by refusing to instruct the jury on those lesser offenses." *Id.* A defendant may, however, affirmatively waive his statute-of-limitations defense to lesser-included offenses. *Id.* But one of the requirements of an effective waiver is that "the waiver does not handicap the defense or contravene any of the public policy reasons motivating the enactment of the statute." *Id.*

"The public policy reasons motivating the enactment of the statute must be those which protect a defendant from prosecution on a charge where

601 So. 2d 219, 220 (Fla. 1992); *see also State v. Washington*, 268 So. 2d 901, 902 (Fla. 1972) (upholding the State's entitlement to a jury charge on necessarily included offenses, even over a defense objection).

the means of defense are hampered by the elapse of time." *Rembert v. State*, 476 So. 2d 721, 722 (Fla. 1st DCA 1985). Permitting "'on again, off again' pleading and waiver of the statute of limitations would, in our opinion, contravene the public policy reasons motivating the statute." *Id.* In *Cartagena*, this court followed *Rembert* and explained that "the defendant cannot selectively waive his statute of limitations defense as to the charges arising out of the criminal episode." 125 So. 3d at 920.

In *Maclean*, we distinguished *Cartagena* and held that where the defendant did not succeed in obtaining a dismissal of *any* charges arising out of the criminal episode based on the statute of limitations, the trial court was required to accept the defendant's waiver and instruct the jury on a single lesser-included offense. 291 So. 3d at 589–90. But, contrary to Kenyon's argument, *Maclean* does not control here because that case did not involve a situation where the defendant was attempting to waive the statute of limitations as to some lesser-included offenses but not others. *Id.* at 590.

Here, the trial court properly refused to allow Kenyon to selectively waive his statute-of-limitations defense as to the lesser-included charges arising out of the criminal episode. Although Kenyon's statute-of-limitations defense was not successful, the reasoning of *Cartagena* still applies. He was not entitled to limit the charged lesser-included offenses to those most favorable to him. Allowing such gamesmanship would contravene the public policy reasons justifying the statute of limitations. A defendant cannot have it both ways by arguing that the lapse of time should be disregarded for some lesser-included offenses but not others.

### *Conclusion*

We have considered the other points raised on appeal and affirm without further discussion.[9] Therefore, we affirm Kenyon's convictions and sentences.

*Affirmed.*

KUNTZ, C.J., and SHEPHERD, J., concur.

---

[9] On the 12-person jury issue, we rely upon *Guzman v. State*, 350 So. 3d 72, 73 (Fla. 4th DCA 2022), *rev. denied* SC2022–1597 (Fla. June 6, 2023), *cert. denied* No. 23–5173 (U.S. May 28, 2024).

\*          \*          \*

*Not final until disposition of timely-filed motion for rehearing.*